# TRAIN, ADMINISTRATOR, ENVIRONMENTAL PROTECTION AGENCY, ET AL. *v.* NATURAL RESOURCES DEFENSE COUNCIL, INC., ET AL.

No. 73–1742.   Argued January 15, 1975—Decided April 16, 1975

Rehnquist, J., delivered the opinion of the Court, in which Burger, C. J., and Brennan, Stewart, White, Marshall, and Blackmun, JJ., joined. Douglas, J., dissented. Powell, J., took no part in the consideration or decision of the case.

*Gerald P. Norton* argued the cause for petitioners. With him on the brief were *Solicitor General Bork, Assistant Attorney General Johnson,* and *Edmund B. Clark*

*Richard E. Ayres* argued the cause for respondents. With him on the brief was *Stephen P. Duggan.**

*Briefs of *amici curiae* urging reversal were filed by *John C. Danforth,* Attorney General, and *Walter W. Nowotny, Jr.,* and *Dan Summers,* Assistant Attorneys General, for the State of Missouri;

MR. JUSTICE REHNQUIST delivered the opinion of the Court.

We granted certiorari in this case, 419 U. S. 823 (1974), to review a judgment of the Court of Appeals for the Fifth Circuit which required petitioner Administrator of the Environmental Protection Agency to disapprove a portion of the implementation plan submitted to him by the State of Georgia pursuant to the Clean Air Amendments of 1970.[1] The case presents an issue of statutory construction which is illuminated by the anatomy of the statute itself, by its legislative history, and by the history of congressional efforts to control air pollution.

I

Congress initially responded to the problem of air pollution by offering encouragement and assistance to the States. In 1955 the Surgeon General was authorized to study the problem of air pollution, to support research, training, and demonstration projects, and to provide technical assistance to state and local governments attempting to abate pollution. 69 Stat. 322. In 1960 Congress directed the Surgeon General to focus his attention on the health hazards resulting from motor vehicle emissions. Pub. L. 86–493, 74 Stat. 162. The Clean Air Act of 1963, 77 Stat. 392, authorized federal authorities to expand their research efforts, to make grants to state air pollu-

---

by *John L. Hill,* Attorney General, *Larry F. York,* First Assistant Attorney General, and *Philip K. Maxwell* and *Douglas G. Caroom,* Assistant Attorneys General, for the State of Texas; by *Max N. Edwards* and *John Hardin Young* for the American Iron and Steel Institute; by *Cameron F. MacRae, Harry H. Voigt,* and *Henry V. Nickel* for the Edison Electric Institute; and by *R. Gordon Gooch* and *Larry B. Feldcamp* for Exxon Corp. et al.

[1] *Natural Resources Defense Council, Inc.* v. *EPA,* 489 F. 2d 390 (1974). We issued a stay of the contested portion of the court's judgment on June 10, 1974, 417 U. S. 942.

tion control agencies, and also to intervene directly to abate *interstate* pollution in limited circumstances. Amendments in 1965, § 101, 79 Stat. 992, and in 1966, 80 Stat. 954, broadened federal authority to control motor vehicle emissions and to make grants to state pollution control agencies.

The focus shifted somewhat in the Air Quality Act of 1967, 81 Stat. 485. It reiterated the premise of the earlier Clean Air Act "that the prevention and control of air pollution at its source is the primary responsibility of States and local governments." *Ibid.* Its provisions, however, increased the federal role in the prevention of air pollution, by according federal authorities certain powers of supervision and enforcement. But the States generally retained wide latitude to determine both the air quality standards which they would meet and the period of time in which they would do so.

The response of the States to these manifestations of increasing congressional concern with air pollution was disappointing. Even by 1970, state planning and implementation under the Air Quality Act of 1967 had made little progress. Congress reacted by taking a stick to the States in the form of the Clean Air Amendments of 1970, Pub. L. 91–604, 84 Stat. 1676, enacted on December 31 of that year. These Amendments sharply increased federal authority and responsibility in the continuing effort to combat air pollution. Nonetheless, the Amendments explicitly preserved the principle: "Each State shall have the primary responsibility for assuring air quality within the entire geographic area comprising such State . . . ." § 107 (a) of the Clean Air Act, as added, 84 Stat. 1678, 42 U. S. C. § 1857c–2 (a). The difference under the Amendments was that the States were no longer given any choice as to whether they would meet this responsibility. For the first time they were required to

attain air quality of specified standards, and to do so within a specified period of time.

The Amendments directed that within 30 days of their enactment the Environmental Protection Agency should publish proposed regulations describing national quality standards for the "ambient air," which is the statute's term for the outdoor air used by the general public. After allowing 90 days for comments on the proposed standards, the Agency was then obliged to promulgate such standards. § 109 (a)(1) of the Clean Air Act, as added, 84 Stat. 1679, 42 U. S. C. § 1857c–4 (a)(1). The standards were to be of two general types: "primary" standards, which in the judgment of the Agency were "requisite to protect the public health," § 109 (b)(1), and "secondary" standards, those that in the judgment of the Agency were "requisite to protect the public welfare from any known or anticipated adverse effects associated with the presence of such air pollutant in the ambient air." § 109 (b)(2).

Within nine months after the Agency's promulgation of primary and secondary air quality standards, each of the 50 States was required to submit to the Agency a plan designed to implement and maintain such standards within its boundaries. § 110 (a)(1) of the Clean Air Act, as added, 84 Stat. 1680, 42 U. S. C. § 1857c–5 (a)(1). The Agency was in turn required to approve each State's plan within four months of the deadline for submission, if it had been adopted after public hearings and if it satisfied eight general conditions set forth in § 110 (a)(2).[2]

---

[2] Section 110 (a)(2), 42 U. S. C. § 1857c–5 (a)(2), reads as follows:

"The Administrator shall, within four months after the date required for submission of a plan under paragraph (1), approve or disapprove such plan, or each portion thereof. The Administrator shall approve such plan, or any portion thereof, if he determines that it was adopted after reasonable notice and hearing and that—

"(A) (i) in the case of a plan implementing a national primary

Probably the principal of these conditions, and the heart of the 1970 Amendments, is that the plan provide for the attainment of the national primary ambient air

ambient air quality standard, it provides for the attainment of such primary standard as expeditiously as practicable but (subject to subsection (e)) in no case later than three years from the date of approval of such plan (or any revision thereof to take account of a revised primary standard); and (ii) in the case of a plan implementing a national secondary ambient air quality standard, it specifies a reasonable time at which such secondary standard will be attained;

"(B) it includes emission limitations, schedules, and timetables for compliance with such limitations, and such other measures as may be necessary to insure attainment and maintenance of such primary or secondary standard, including, but not limited to, land-use and transportation controls;

"(C) it includes provision for establishment and operation of appropriate devices, methods, systems, and procedures necessary to (i) monitor, compile, and analyze data on ambient air quality and, (ii) upon request, make such data available to the Administrator;

"(D) it includes a procedure, meeting the requirements of paragraph (4), for review (prior to construction or modification) of the location of new sources to which a standard of performance will apply;

"(E) it contains adequate provisions for intergovernmental cooperation, including measures necessary to insure that emissions of air pollutants from sources located in any air quality control region will not interfere with the attainment or maintenance of such primary or secondary standard in any portion of such region outside of such State or in any other air quality control region;

"(F) it provides (i) necessary assurances that the State will have adequate personnel, funding, and authority to carry out such implementation plan, (ii) requirements for installation of equipment by owners or operators of stationary sources to monitor emissions from such sources, (iii) for periodic reports on the nature and amounts of such emissions; (iv) that such reports shall be correlated by the State agency with any emission limitations or standards established pursuant to this Act, which reports shall be available at reasonable times for public inspection; and (v) for authority com-

quality standards in the particular State "as expeditiously as practicable but . . . in no case later than three years from the date of approval of such plan." § 110 (a) (2)(A). In providing for such attainment, a State's plan must include "emission limitations, schedules, and timetables for compliance with such limitations"; it must also contain such other measures as may be necessary to insure both timely attainment and subsequent maintenance of national ambient air standards. § 110 (a)(2)(B).

Although the Agency itself was newly organized, the States looked to it for guidance in formulating the plans they were required to submit. On April 7, 1971—scarcely three months after the enactment of the Clean Air Amendments—the Agency published proposed guidelines for the preparation, adoption, and submission of such plans. 36 Fed. Reg. 6680. After receiving numerous comments, including those from respondent Natural Resources Defense Council, Inc. (NRDC), it issued final guidelines on August 14, 1971, 36 Fed. Reg. 1586. See 40 CFR Part 51 (1974). The national standards themselves were timely promulgated on April 30, 1971, 36 Fed. Reg. 8186. See 40 CFR Part 50 (1974).

---

parable to that in section 303, and adequate contingency plans to implement such authority;

"(G) it provides, to the extent necessary and practicable, for periodic inspection and testing of motor vehicles to enforce compliance with applicable emission standards; and

"(H) it provides for revision, after public hearings, of such plan (i) from time to time as may be necessary to take account of revisions of such national primary or secondary ambient air quality standard or the availability of improved or more expeditious methods of achieving such primary or secondary standard; or (ii) whenever the Administrator finds on the basis of information available to him that the plan is substantially inadequate to achieve the national ambient air quality primary or secondary standard which it implements."

No one can doubt that Congress imposed upon the Agency and States a comprehensive planning task of the first magnitude which was to be accomplished in a relatively short time. In the case of the States, it was soon realized that in order to develop the requisite plans within the statutory nine-month deadline, efforts would have to be focused on determining the stringent emission limitations necessary to comply with national standards. This was true even though compliance with the standards would not be necessary until the attainment date, which normally would be three years after Agency approval of a plan. The issue then arose as to how these stringent limitations, which often could not be satisfied without substantial research and investment, should be applied during the period prior to that date.

One approach was that adopted by Florida, under which the plan's emission limitations would not take effect until the attainment date. Under this approach, no source is subject to enforcement actions during the preattainment period, but all are put on notice of the limitations with which they must eventually comply.[3] Since the Florida approach basically does not require preattainment date pollution reductions on the part of those sources which might be able to effect them,[4] the Agency encouraged an alternative approach. Under it a State's emission limitations would be immediately effective. The State, how-

---

[3] While sources would not be subject to enforcement actions based on their levels of emissions prior to the attainment date, they could be required to adhere to schedules for the planning, contracting, and construction necessary to assure that their emissions would be within permissible levels as of the attainment date. See 40 CFR §§ 51.15 (c), 52.524 (b) (1974).

[4] At least in the case of Florida, this approach has apparently been modified by subsequent adoption of schedules which require compliance by a number of specified sources prior to July 1, 1975. See 40 CFR § 52.524 (c) (1974).

ever, would have the authority to grant variances to particular sources which could not immediately comply with the stringent emission limitations necessary to meet the standards.

Georgia chose the Agency's preferred approach.[5]   Its plan provided for immediately effective categorical emission limitations, but also incorporated a variance procedure whereby particular sources could obtain individually tailored relief from general requirements.   This variance provision, Ga. Code Ann. § 88-912 (1971),[6] was one of the

---

[5] All other States within the Fifth Circuit, except Florida, also adopted plans with limitations which were effective immediately or, in the case of Texas, only a few months thereafter.

[6] Georgia Code Ann. § 88-912 (1971) reads as follows: "Variances.—

"The department may grant specific or general classes of variances from the particular requirements of any rule, regulation or general order to such specific persons or class of persons or such specific source or general classes of sources of air contaminants upon such conditions as it may deem necessary to protect the public health and welfare, if it finds that strict compliance with such rule, regulation or general order is inappropriate because of conditions beyond the control of the person or classes of persons granted such variances, or because of special circumstances which would render strict compliance unreasonable, unduly burdensome, or impractical due to special physical conditions or causes, or because strict compliance would result in substantial curtailment or closing down of one or more businesses, plants or operations, or because no alternative facility or method of handling is yet available.   Such variances may be limited in time.   In determining whether or not such variances shall be granted, the department shall give consideration to the protection of the public health, safety and general welfare of the public, and weigh the equities involved and the relative advantages and disadvantages to the resident and the occupation or activity affected.   Any person or persons seeking a variance shall do so by filing a petition therefor with the director of the department.   The director shall promptly investigate such petition and make a recommendation as to the disposition thereof.   If such recommendation is against the granting of the variance, a hearing shall be held thereon

bases upon which the Agency's approval of the Georgia plan was successfully challenged by respondents in the Court of Appeals. It is the only aspect of that court's decision as to which the Agency petitioned for certiorari.

## II

The Agency's approval of Georgia's variance provision was based on its interpretation of § 110 (a)(3),[7] which provides that the Agency shall approve any revision of an implementation plan which meets the § 110 (a)(2) requirements applicable to an original plan. The Agency concluded that § 110 (a)(3) permits a State to grant individual variances from generally applicable emission standards, both before and after the attainment date, so long as the variance does not cause the plan to fail to comply with the requirements of § 110 (a)(2). Since that section requires, *inter alia,* that primary ambient air standards be attained by a particular date, it is of some consequence under this approach whether the period for which the variance is sought extends beyond that date. If it does not, the practical effect of treating such preattainment date variances as revisions is that they can be granted rather freely.

This interpretation of § 110 (a)(3) was incorporated in the Agency's original guidelines for implementation

---

within 15 days after notice to the petitioner. If the recommendation of the director is for the granting of a variance, the department may do so without a hearing: Provided, however, that upon the petition of any person aggrieved by the granting of a variance, a public hearing shall be held thereon. A variance granted may be revoked or modified by the department after a public hearing which shall be held after giving at least 15 days prior notice. Such notice shall be served upon all persons, known to the department, who will be subjected to greater restrictions if such variance is revoked or modified, or are likely to be affected or who have filed with the department a written request for such notification."

[7] The pertinent text of § 110 (a)(3) appears *infra,* at 75.

plans, 40 CFR §§ 51.6 (c), 51.32 (f) (1973).[8] Although a spokesman for respondent NRDC had earlier stated that the Agency's guideline in this regard "correctly provides that variances which do not threaten attainment of a national standard are to be considered revisions of the plan," [9] that organization later developed second thoughts on the matter. Its present position, in which it is joined by another environmental organization and by two individual respondents who reside in affected air quality control regions within the State of Georgia, is that variances applicable to individual sources may be approved only if they meet the stringent procedural and substantive standards of § 110 (f).[10] This section permits one-year "postponements" of any requirement of a plan, subject to conditions which will be discussed below.

The Court of Appeals agreed with respondents, and ordered the Agency to disapprove Georgia's variance provision, although it did not specify which of the § 110 (a)(2) requirements were thereby violated.[11] It held

[8] Title 40 CFR § 51.32 (f) (1973) reads as follows:

"A State's determination to defer the applicability or any portion(s) of the control strategy with respect to such source(s) will not necessitate a request for postponement under this section unless such deferral will prevent attainment or maintenance of a national standard within the time specified in such plan: *Provided, however,* That any such determination will be deemed a revision of an applicable plan under § 51.6."

[9] Hearings, on Implementation of the Clean Air Act Amendments of 1970—Part I (Title I), before the Subcommittee on Air and Water Pollution of the Senate Committee on Public Works, 92d Cong., 2d Sess., 45 n. 51 (statement of Richard E. Ayres).

[10] The text of § 110 (f) appears *infra,* at 75–76, and n. 14.

[11] Other Circuits which have ordered the disapproval of implementation plan variance procedures have likewise failed to identify the offended requirement, even though § 110 (a)(2) quite clearly mandates approval of any plan which satisfies its minimum conditions. See n. 2, *supra.* Since petitioners have not raised the point in this Court, we have no occasion to consider it.

that while the revision authority of § 110 (a)(3) was available for *generally* applicable changes of an implementation plan, the postponement provision of § 110 (f) was the only method by which *individual* sources could obtain relief from applicable emission limitations. In reaching this conclusion the court rejected petitioners' suggestion that whether a proposed variance should be treated as a "revision" under § 110 (a)(3), or as a "postponement" under § 110 (f), depended on whether it would affect attainment of a national ambient air standard, rather than on whether it applied to one source or to many.

Other Circuits have also been confronted with this issue, and while none has adopted the Agency's position, all have differed from the Fifth Circuit. The first case was *Natural Resources Defense Council* v. *EPA,* 478 F. 2d 875 (CA1 1973). For reasons to be discussed, *infra,* at 91–94, the First Circuit rejected the revision authority as a basis for a variance procedure. It nonetheless concluded that prior to the three-year date for mandatory attainment of primary standards, a State could grant variances to sources which could not immediately meet applicable emission limitations. The court reasoned:

> "We can see value in permitting a state to impose strict emission limitations now, subject to individual exemptions if practicability warrants; otherwise it may be forced to adopt less stringent limitations in order to accommodate those who, notwithstanding reasonable efforts, are as yet unable to comply.
>
> "The Administrator sees his power to allow such exemption procedures as deriving from the 'revision' authority in § [110] (a)(3). We tend to view it more as a necessary adjunct to the statutory scheme, which anticipates greater flexibility during the pre-attainment period." 478 F. 2d, at 887.

The First Circuit's resolution, which has been described as "Solomonesque," is not tied to any specific provision of the Clean Air Act. Rather, it is quite candidly a judicial creation providing flexibility which, according to its creators, Congress may be inferred to have intended to provide. Two other Circuits subsequently followed the First Circuit. *Natural Resources Defense Council* v. *EPA*, 483 F. 2d 690, 693–694 (CA8 1973); *Natural Resources Defense Council* v. *EPA*, 494 F. 2d 519, 523 (CA2 1974). Neither expanded on the First Circuit's reasoning.

The Ninth Circuit has adopted a third approach to this question, in *Natural Resources Defense Council* v. *EPA*, 507 F. 2d 905, 911–917 (1974). After considering legislative history, the Ninth Circuit concluded that Congress did not intend the postponement mechanism to be the exclusive source for variances. But the court also did not adopt the Agency's view that variances could be authorized as § 110 (a)(3) revisions, although it did not explain its rejection of this interpretation. Rather, the Ninth Circuit agreed with the First Circuit that flexibility was "a necessary adjunct to the statutory scheme." It explained:

> "As long as a possible variance from a state plan will not preclude the attainment or maintenance of such standards, we discern no legislative intent to commit a state, in toto, to its initial plan, without any flexibility whatsoever." 507 F. 2d, at 913.

The Ninth Circuit, however, rejected the First Circuit's distinction between the preattainment and postattainment periods. It concluded that statutory support for flexibility was as strong after the attainment date as before, especially in light of the Act's encouragement of the States to adopt plans even stricter than those required

to attain national standards.[12]   The court thus adopted an approach which differs from the Agency's, but which reaches the same result—authorization of variances on standards other than those required for § 110 (f) postponements, both *before and after* the attainment date, so long as the variance does not prevent timely attainment and subsequent maintenance of national ambient air standards.

After the Courts of Appeals for the First, Eighth, Fifth, and Second Circuits had spoken, but prior to the decision of the Ninth Circuit, the Agency modified its guidelines to comply with the then-unanimous rulings that after the attainment date the postponement provision was the only basis for obtaining a variance.  39 Fed. Reg. 34533–34535, adding 40 CFR §§ 51.11 (g), 51.15 (d) and revising § 51.32 (f).   At the same time, the Agency formally disapproved variance provisions to the extent they authorized variances extending beyond attainment dates, unless the standards of § 110 (f) were met.   39 Fed. Reg. 34535, adding 40 CFR § 52.26.

Because the Agency has conformed its regulations to the decisions of the First, Eighth, and Second Circuits, this case on its facts is now limited to the validity of the Georgia variance provision insofar as it authorizes variances effective before Georgia's attainment date, which is in July 1975.[13]   The Agency nonetheless has not abandoned its original view that the revision section authorizes variances which do not interfere with the attainment or maintenance of national ambient air standards.   Moreover, the Agency is candid in admitting that should we

---

[12] See § 116 of the Clean Air Act, as amended, 84 Stat. 1689 and 88 Stat. 259, 42 U. S. C. § 1857d–1 (1970 ed., Supp. IV).

[13] The attainment dates for several air quality control regions within other Fifth Circuit States are as late as May 31, 1977, by virtue of two-year extensions granted pursuant to § 110 (e).   See n. 20, *infra*.

base our decision on its interpretation of § 110 (a)(3), the decision would support the approval of implementation plans which provide for variances effective after the attainment date.

The disparity among the Courts of Appeals rather strongly indicates that the question does not admit of an easy answer. Without going so far as to hold that the Agency's construction of the Act was the only one it permissibly could have adopted, we conclude that it was at the very least sufficiently reasonable that it should have been accepted by the reviewing courts.

### III

Both of the sections in controversy are contained in § 110 of the amended Clean Air Act, which is entitled "Implementation Plans." Section 110 (a)(3) provides in pertinent part:

> "(A) The Administrator shall approve any revision of an implementation plan applicable to an air quality control region if he determines that it meets the requirement of paragraph (2) and has been adopted by the State after reasonable notice and public hearings."

Section 110 (f) provides:

> "(1) Prior to the date on which any stationary source or class of moving sources is required to comply with any requirement of an applicable implementation plan the Governor of the State to which such plan applies may apply to the Administrator to postpone the applicability of such requirement to such source (or class) for not more than one year. If the Administrator determines that—
>
> "(A) good faith efforts have been made to comply with such requirement before such date,
>
> "(B) such source (or class) is unable to comply

with such requirement because the necessary technology or other alternative methods of control are not available or have not been available for a sufficient period of time,

·"(C) any available alternative operating procedures and interim control measures have reduced or will reduce the impact of such source on public health, and

"(D) the continued operation of such source is essential to national security or to the public health or welfare,

"then the Administrator shall grant a postponement of such requirement." [14]

---

[14] Section 110 (f) (2) specifies the procedural requirements for postponement. It reads as follows:

"(2) (A) Any determination under paragraph (1) shall (i) be made on the record after notice to interested persons and opportunity for hearing, (ii) be based upon a fair evaluation of the entire record at such hearing, and (iii) include a statement setting forth in detail the findings and conclusions upon which the determination is based.

"(B) Any determination made pursuant to this paragraph shall be subject to judicial review by the United States court of appeals for the circuit which includes such State upon the filing in such court within 30 days from the date of such decision of a petition by any interested person praying that the decision be modified or set aside in whole or in part. A copy of the petition shall forthwith be sent by registered or certified mail to the Administrator and thereupon the Administrator shall certify and file in such court the record upon which the final decision complained of was issued, as provided in section 2112 of Title 28, United States Code. Upon the filing of such petition the court shall have jurisdiction to affirm or set aside the determination complained of in whole or in part. The findings of the Administrator with respect to questions of fact (including each determination made under subparagraphs (A), (B), (C), and (D) of paragraph (1)) shall be sustained if based upon a fair evaluation of the entire record at such hearing.

"(C) Proceedings before the court under this paragraph shall take precedence over all the other causes of action on the docket and

As previously noted, respondents contend that "variances" applicable to individual sources—for example, a particular factory—may be approved only if they meet the stringent procedural and substantive standards set forth in § 110 (f). As is apparent from the text of § 110 (f), its postponements may be for no more than one year, may be granted only if application is made prior to the date of required compliance, and must be supported by the Agency's determination that the source's continued operation "is essential to national security or to the public health or welfare." Petitioners, on the other hand, rely on the revision authority of § 110 (a)(3) for the contention that a state plan may provide for an individual variance from generally applicable emission limitations so long as the variance does not cause the plan to fail to comply with the requirements of § 110 (a)(2). Since a variance would normally implicate only the § 110 (a)(2)(A) requirement that plans provide for attainment and maintenance of national ambient air standards, treatment as revisions would result in variances being readily approved in two situations: first, where the variance does not defer compliance beyond the attainment date; [15] and second, where the national standards have been attained and the variance is not so great that a plan incorporating it could not insure their continued maintenance. Moreover, a § 110 (a)(3) revision may be granted on the basis of hearings conducted by the State, whereas a § 110 (f)

---

shall be assigned for hearing and decision at the earliest practicable date and expedited in every way.

"(D) Section 307 (a) of this title (relating to subpoenas) shall be applicable to any proceeding under this subsection."

[15] We recognize that attainment of the standards is required as soon as "practicable," and that a preattainment variance could not be granted under the revision authority if immediate compliance by a particular source were "practicable" and such compliance would expedite attainment. See *infra*, at 96–97, and n. 30.

postponement is available only after the Agency itself conducts hearings.

There is thus considerable practical importance attached to the issue of whether variances are to be treated as revisions or as postponements, or for that matter, as the First Circuit would have it, as neither until the mandatory attainment date but as postponements thereafter. This practical importance reaches not merely the operator of a particular source who believes that circumstances justify his receiving a variance from categorical limitations. It also reaches the broader issue of whether Congress intended the States to retain any significant degree of control of the manner in which they attain and maintain national standards, at least once their initial plans have been approved or, under the First Circuit's approach, once the mandatory attainment date has arrived. To explain our conclusion as to Congress' intent, it is necessary that we consider the revision and postponement sections in the context of other provisions of the amended Clean Air Act, particularly those which distinguish between national ambient air standards and emission limitations.

As we have already noted, primary ambient air standards deal with the quality of outdoor air, and are fixed on a nationwide basis at levels which the Agency determines will protect the public health. It is attainment and maintenance of these national standards which § 110 (a) (2)(A) requires that state plans provide. In complying with this requirement a State's plan must include "emission limitations," which are regulations of the composition of substances emitted into the ambient air from such sources as power plants, service stations, and the like. They are the specific rules to which operators of pollution sources are subject, and which if enforced should result in ambient air which meets the national standards.

The Agency is plainly charged by the Act with the responsibility for setting the national ambient air standards. Just as plainly, however, it is relegated by the Act to a secondary role in the process of determining and enforcing the specific, source-by-source emission limitations which are necessary if the national standards it has set are to be met.[16] Under § 110 (a)(2), the Agency is *required* to approve a state plan which provides for the timely attainment and subsequent maintenance of ambient air standards, and which also satisfies that section's other general requirements. The Act gives the Agency no authority to question the wisdom of a State's choices of emission limitations if they are part of a plan which satisfies the standards of § 110 (a)(2), and the Agency may devise and promulgate a specific plan of its own only if a State fails to submit an implementation plan which satisfies those standards. § 110 (c). Thus, so long as the ultimate effect of a State's choice of emission limitations is compliance with the national standards for ambient air, the State is at liberty to adopt whatever mix of emission limitations it deems best suited to its particular situation.

This analysis of the Act's division of responsibilities is not challenged by respondents insofar as it concerns the process of devising and promulgating an initial imple-

---

[16] Exceptions are the Agency's authority to set emission limitations for new motor vehicles, § 202 *et seq.* of the Clean Air Act, as amended, 84 Stat. 1690–1698 and 88 Stat. 258, 42 U. S. C. § 1857f–1 *et seq.* (1970 ed., Supp. IV); to set emission limitations for aircraft, § 231 *et seq.* of the Clean Air Act, as added, 84 Stat. 1703–1705, 42 U. S. C. § 1857f–9 *et seq.*; to set emission limitations for categories of new stationary sources, § 111 of the Clean Air Act, as added, 84 Stat. 1683, and amended, 85 Stat. 464, 42 U. S. C. § 1857c–6 (1970 ed. and Supp. I); and to regulate the sale of fuels and fuel additives, § 211 of the Clean Air Act, as amended, 84 Stat. 1698 and 85 Stat. 464; 42 U. S. C. § 1857f–6c (1970 ed. and Supp. I).

mentation plan. Respondents do, however, deny that the States have such latitude once the initial plan is approved. Yet the third paragraph of § 110 (a), and the one immediately following the paragraphs which specify that States shall file implementation plans and that the Agency shall approve them if they satisfy certain broad criteria, is the section which *requires* the Agency to "approve any revision of an implementation plan" if it "determines that it meets the requirements" of § 110 (a)(2). On its face, this provision applies to *any* revision, without regard either to its breadth of applicability, or to whether it is to be effective before or after the attainment date; rather, Agency approval is subject only to the condition that the revised plan satisfy the general requirements applicable to original implementation plans. Far from evincing congressional intent that the Agency assume control of a State's emission limitations mix once its initial plan is approved, the revision section is to all appearances the mechanism by which the States may obtain approval of their developing policy choices as to the most practicable and desirable methods of restricting total emissions to a level which is consistent with the national ambient air standards.

In order to challenge this characterization of § 110 (a)(3), respondents principally rely on the contention that the postponement provision, § 110 (f), is the only mechanism by which exceptions to a plan's requirements may be obtained, under any circumstances. Were this an accurate description of § 110 (f), we would agree that the revision authority does not have the broad application asserted by the Agency. Like the Ninth Circuit,[17] however, we believe that § 110 (f) serves a function different from that of supervising state efforts to modify the initial

---

[17] *Natural Resources Defense Council* v. *EPA*, 507 F. 2d 905, 911–913 (1974).

mix of emission limitations by which they implement national standards.

In our view, § 110 (f) is a safety valve by which may be accorded, under certain carefully specified circumstances, exceptions to the national standards themselves. That this is its role is strongly suggested by the process by which it became a part of the Clean Air Act. The House version of the Amendment, H. R. 17255, 91st Cong., 2d Sess., contained no provisions for either postponements or, most significantly, mandatory deadlines for the attainment of national ambient air standards. The Senate bill, S. 4358, 91st Cong., 2d Sess., did contain both the three-year deadline, which now appears in § 110 (a)(2), and the predecessor of the present § 110 (f). That predecessor [18] permitted the governor of a

---

[18] Section 111 (f) of the Clean Air Act, as would have been added by S. 4358, 91st Cong., 2d Sess., read as follows:

"(1) No later than one year before the expiration of the period for the attainment of ambient air of the quality established for any national ambient air quality standard promulgated pursuant to section 110 of this Act, the Governor of a State in which is located all or part of an air quality control region designated or established pursuant to this Act may file a petition in the district court of the United States for the district in which all or a part of such air quality control region is located against the United States for relief from the effect of such expiration (A) on such region or portion thereof, or (B) on a person or persons in such air quality control region. In the event that such region is an interstate air quality control region or portion thereof, any Governor of any State which is wholly or partially included in such interstate region shall be permitted to intervene for the presentation of evidence and argument on the question of such relief.

"(2) Any action brought pursuant to this subsection shall be heard and determined by a court of three judges in accordance with the provisions of section 2284 of title 28 of the United States Code and appeal shall be to the Supreme Court. Proceedings before the three judge court, as authorized by this subsection, shall take precedence on the docket over all other causes of action and shall be assigned

State to petition a three-judge district court for "relief from the effect" of expiration of the three-year deadline as to a region or persons, and provided for the grant of such relief upon a showing of conditions similar to those

for hearing and decision at the earliest practicable date and expedited in every way.

"(3)(A) In any such proceeding the Secretary shall intervene for the purpose of presenting evidence and argument on the question of whether relief should be granted.

"(B) The court, in its discretion, may permit any interested person residing in any affected State to intervene for the presentation of evidence and argument on the question of relief.

"(4) The court, in view of the paramount interest of the United States in achieving ambient air quality necessary to protect the health of persons shall grant relief only if it determines such relief is essential to the public interest and the general welfare of the persons in such region, after finding—

"(A) that substantial efforts have been made to protect the health of persons in such region; and

"(B) that means to control emissions causing or contributing to such failure are not available or have not been available for a sufficient period to achieve compliance prior to the expiration of the period to attain an applicable standard; or

"(C) that the failure to achieve such ambient air quality standard is caused by emissions from a Federal facility for which the President has granted an exemption pursuant to section 118 of this Act.

"(5) The court, in granting such relief shall not extend the period established by this Act for more than one year and may grant renewals for additional one year periods only after the filing of a new petition with the court.

"(6) The Secretary, in consultation with any affected State or States, shall take such action as may be necessary to modify any implementation plan or formulate any new implementation plan for the period of such extension.

"(7) No extension granted pursuant to this section shall effect compliance with any emission requirement, timetable, schedule of compliance, or other element of any implementation plan unless such requirement, timetable, schedule of compliance, or other element of such plan is the subject of the specific order extending the time for compliance with such national ambient air quality standard."

now appearing in § 110 (f). Under its language the postponement provision plainly applied only when deferral of a national deadline was sought.[19]

The Conference Committee adopted the Senate's general approach to the deadline issue. Its report states:

> *"The conference substitute follows the Senate amendment in establishing deadlines for implementing primary ambient air quality standards* but leaves the States free to establish a reasonable time period within which secondary ambient air quality standards will be implemented. *The conference substitute modifies the Senate amendment in that it allows the Administrator to grant extensions for good causes shown upon application by the Governors."* H. R. Conf. Rep. No. 91-1783, p. 45 (1970). (Emphasis added.)

Nowhere does the report suggest that other changes in the Senate's proposed § 111 (f) were intended to dramatically broaden its reach, such that it would not merely be available to obtain deferral of the strict deadlines for compliance with national standards, but would also be the exclusive mechanism for any ameliorative modification of a plan, no matter how minor.

---

[19] This fact, as well as the "safety valve" nature of the Senate's predecessor to the postponement provision, is also apparent from the Senate report:

"Finally, the Committee would recognize that compliance with the national ambient air quality standards deadline may not be possible. If a Governor judges that any region or regions or portions thereof within his State will not meet the national ambient air quality standard within the time provided, [§ 111 (f) of] the bill would authorize him—one year before the deadline—to file a petition against the United States in the District Court of the United States for the district where such region or portion thereof is located for relief from the effect of such expiration." S. Rep. No. 91-1196, pp. 14-15 (1970).

That the postponement provision was intended merely as a method of escape from the mandatory deadlines becomes even clearer when one considers the summary of the conference's work which Senator Muskie presented to the Senate. The summary referred to a provision under which a single two-year extension of the deadline could be obtained were it shown to be necessary at the time a State's initial plan was submitted. It then immediately discussed the postponement provision, as follows:

> "A Governor may also apply for a postponement of *the deadline* if, when *the deadline* approaches, it is impossible for a source to meet a requirement under an implementation plan, interim control measures have reduced (or will reduce) the adverse health effects of the source, and the continued operation of the source is essential to national security or the public health or welfare of that State." 116 Cong. Rec. 42384–42385. (Emphasis added.)

This limited view of the role of § 110 (f) is reinforced by comparison with the section which immediately precedes it in the statute, § 110 (e).[20] This is the provision

---

[20] Section 110 (e), 42 U. S. C. § 1857c–5 (e), reads as follows:

"(1) Upon application of a Governor of a State at the time of submission of any plan implementing a national ambient air quality primary standard, the Administrator may (subject to paragraph (2)) extend the three-year period referred to in subsection (a)(2) (A)(i) for not more than two years for an air quality control region if after review of such plan the Administrator determines that—

"(A) one or more emission sources (or classes of moving sources) are unable to comply with the requirements of such plan which implement such primary standard because the necessary technology or other alternatives are not available or will not be available soon enough to permit compliance within such three-year period, and

"(B) the State has considered and applied as a part of its plan reasonably available alternative means of attaining such primary

to which Senator Muskie's summary was obviously re-
ferring when it stated that the three-year deadline could
be extended for up to two years if proper application were
made at the time a State first submitted its plan. Like
§ 110 (f), § 110 (e) is available only if an emission source
is unable to comply with plan requirements because "the
necessary technology or other alternatives are not avail-
able or will not be available soon enough to permit com-
pliance." Section 110 (e) also contains a requirement
parallel to that of § 110 (f)(1)(C), that available alter-
native procedures and control measures have been consid-
ered and utilized. Unlike § 110 (f), however, § 110 (e)
contains no requirement that "the continued operation of
such source is essential to national security or to the pub-
lic health or welfare." Section 110 (e) thus permits a
two-year extension on a showing considerably less strin-
gent than that required for a § 110 (f) one-year postpone-
ment. This disparity is quite logical, however, because
the relief under § 110 (e) is limited to an initial two-year
period, whereas that under § 110 (f) is available at any
time, so long as application is made prior to the effective
date of the relevant requirement.[21]

---

standard and has justifiably concluded that attainment of such pri-
mary standard within the three years cannot be achieved.

"(2) The Administrator may grant an extension under paragraph
(1) only if he determines that the State plan provides for—

"(A) application of the requirements of the plan which implement
such primary standard to all emission sources in such region other
than the sources (or classes) described in paragraph (1)(A) within
the three-year period, and

"(B) such interim measures of control of the sources (or classes)
described in paragraph (1)(A) as the Administrator determines to
be reasonable under the circumstances."

[21] The language of § 110 (f) would also seem to support any number
of successive one-year postponements, so long as application is
timely. There is potentially some dispute as to this, however, be-
cause the Conference Committee deleted, without comment, language

On the other hand, the disparity between the standards of § 110 (e) and those of § 110 (f) would be inexplicable were § 110 (f) also the sole mechanism by which States could modify the particular emission limitations mix incorporated in their initial implementation plans, even though the desired modifications would have no impact on the attainment or maintenance of national standards. Respondents' interpretation requires the anomalous conclusion that Congress, having stated its goal to be the attainment and maintenance of specified ambient air standards, nonetheless made it significantly more difficult for a State to modify an emission limitations mix which met those standards both before and after modification than for a State to obtain a two-year deferral in the attainment of the standards themselves. The interpretation suffers, therefore, not only from its contrariety to the revision authority which Congress provided, but also from its willingness to ascribe inconsistency to a carefully considered congressional enactment.

We believe that the foregoing analysis of the structure and legislative history of the Clean Air Amendments shows that Congress intended to impose national ambient air standards to be attained within a specific period of time. It also shows that in §§ 110 (e) and (f) Congress carefully limited the circumstances in which timely attainment and subsequent maintenance of these standards could be compromised. We also believe that Congress, consistent with its declaration that "[e]ach State

in the Senate predecessor to § 110 (f) that explicitly permitted successive postponements. See proposed § 111 (f) (5) of the Clean Air Act, as would have been added by S. 4358, 91st Cong., 2d Sess., n. 18, *supra*. This question is not presented by this case, and we do not decide it. We simply note the possibility of successive postponements as an additional element which would reasonably explain the imposition of harsher standards in § 110 (f) than in § 110 (e).

shall have the primary responsibility for assuring air quality" within its boundaries, § 107 (a), left to the States considerable latitude in determining specifically how the standards would be met. This discretion includes the continuing authority to revise choices about the mix of emission limitations. We therefore conclude that the Agency's interpretation of §§ 110 (a)(3) and 110 (f) was "correct," to the extent that it can be said with complete assurance that any particular interpretation of a complex statute such as this is the "correct" one. Given this conclusion, as well as the facts that the Agency is charged with administration of the Act, and that there has undoubtedly been reliance upon its interpretation by the States and other parties affected by the Act, we have no doubt whatever that its construction was sufficiently reasonable to preclude the Court of Appeals from substituting its judgment for that of the Agency. *Udall* v. *Tallman*, 380 U. S. 1, 16–18 (1965); *McLaren* v. *Fleischer*, 256 U. S. 477, 480–481 (1921). We are not persuaded to the contrary by any of the arguments advanced by respondents or by the Courts of Appeals which have rejected § 110 (a)(3) as authority for granting variances. To these various arguments we now turn.

## IV

The principal basis on which the Fifth Circuit rejected the Agency's view of the revision and postponement sections was its analysis of their language. The court focused first on the fact that § 110 (f) speaks in terms of *"any* stationary source," and of the postponement of *"any* requirement of an applicable implementation plan." (Emphasis added.) This language, according to the Fifth Circuit, belies the Agency's contention that the postponement section is inapplicable to those variances which do not jeopardize the attainment or maintenance

of national standards. The court went on to state, without citation or supporting reasoning:

> "A revision is a change in a generally applicable requirement; a postponement or variance [is a] change in the application of a requirement to a particular party. The distinction between the two is familiar and clear." 489 F. 2d 390, 401.

We think that the Fifth Circuit has read more into § 110 (f), and more out of § 110 (a)(3), than careful analysis can sustain. In the first place, the "any stationary source" and "any requirement" language of § 110 (f) serves only to define the matters with respect to which the governor of a State *may* apply for a postponement. The language does not, as the Fifth Circuit would have it, state that all sources desirous of any form of relief *must* rely solely on the postponement provision. While § 110 (f) makes its relief available to any source which can qualify for it, regardless of whether the relief would jeopardize national standards, the section does not even suggest that other forms of relief, having no impact on the national goal of achieving air quality standards, are not also available on appropriately less rigorous showings.

As for the Fifth Circuit's observation that "a revision is a change in a generally applicable requirement," whereas a "postponement or variance" deals with particular parties, we are not satisfied that the distinction is so "familiar and clear." While a variance is generally thought to be of specific applicability,[22] whether a revision

---

[22] We note, however, that there may be substantial difficulties in determining whether a proposed modification is of general or specific application. Requirements written in general terms may in fact be of very specific impact, as a result of the limited number of similar sources, or even of conscious efforts to evade restrictions on "specific" changes. For example, the regulation at issue in *Getty*

is general or specific depends on what is being revised. In this instance, it is implementation plans which are being revised, and it is clear that such plans may be quite detailed, both as to sources and the remedial steps required of the sources. Not only does § 110 (a)(2)(B) specify that a plan shall include "emission limitations, schedules, and timetables for compliance," [23] but respondents themselves have urged that the very specific variances which have already been granted in Georgia should have been, and may still be, treated as "compliance schedules" contained within the original plan.[24]

A further difficulty with the Fifth Circuit's analysis of the language of §§ 110 (a)(3) and 110 (f) is that it entirely overlooks an obvious distinction between revisions and postponements. In normal usage, to "postpone" is to defer, whereas to "revise" is to remake or amend. In the implementation plan context, normal usage would suggest that a postponement is a deferral of the effective date of a requirement which remains a part of the applicable plan, whereas a revision is a change in the plan itself which deletes or modifies the requirement. If by revision a requirement of a plan is *removed,* then a person seeking relief from that requirement has no

---

*Oil Co.* v. *Ruckelshaus,* 467 F. 2d 349 (CA3 1972), spoke of all fuel-burning equipment having a maximum rate of heat input equal to or greater than 500 million Btu per hour, and located in New Castle County, Del., south of U. S. Route 40. There was only one such installation.

[23] The Florida plan, for example, presently contains compliance schedules which specify not merely particular business operations, but also the principal emission sources within particular operations. See 40 CFR § 52.524 (c) (1974).

[24] Brief for Respondents 48–49. Respondents do not, however, suggest any statutory basis for incorporating compliance schedules into a plan once it has been approved. We know of none save the revision authority which respondents would have us declare unavailable for modifications of a specific nature. ·

need to seek its *postponement,* and § 110 (f) is by its terms inapplicable. But if such a person cannot obtain a revision, because for example the plan as so revised would no longer insure timely attainment of the national standards, then under the Act he has no alternative but to comply or to obtain a postponement of the requirement's effective date—if he can satisfy the stringent conditions of § 110 (f). This distinction between the two is so straightforward, and so consistent with the structure and history of the Act, as discussed in Part III of this opinion, that we perceive no basis for the Fifth Circuit's strained line of analysis.[25]

The Fifth Circuit also relied on the "technology forcing" nature of the Clean Air Amendments of 1970. It reasoned that because the statute was intended to force technology to meet specified, scheduled standards,

---

[25] Much of the confusion which has afflicted the Fifth Circuit and the other Courts of Appeals probably has been generated by the States' practice of referring to exceptions from categorical limitations as "variances" rather than as "revised compliance schedules," and also by the fact that in practice a "variance" typically has the effect of deferring the date on which compliance with categorical limitations is required. Our concern, however, is not with the nomenclature assigned to exceptions, but rather with whether they are of a nature that may be authorized as § 110 (a) (3) revisions. That an exception which does not jeopardize national standards may in effect be a deferral does not change the facts (1) that it revises a plan from one which requires a source to comply by, say, July 1972, to one which requires its compliance as of, say, May 1975, and (2) that the plan as so revised still possesses all of the characteristics which it must under § 110 (a) (2). An exception which *does* jeopardize national standards, on the other hand, cannot be a revision because it would deprive the revised plan of a characteristic without which it cannot under the Act be an applicable plan. See § 110 (d) which defines "applicable implementation plan" as the "implementation plan, or most recent revision thereof, which has been approved under [§ 110 (a) (2)] . . . ." Such an exception must be obtained, if at all, as a postponement of the requirements of the applicable plan.

it was essential to insure that commitments made at the planning stage could not be readily abandoned when the time for compliance arrived. According to the Fifth Circuit, § 110 (f) "is the device Congress chose to assure this." 489 F. 2d, at 401. Clearly § 110 (f) does present a formidable hurdle for those proposed departures from earlier commitments which are in fact subject to its stringent conditions. What the Fifth Circuit failed to consider, however, is that so long as the national standards are being attained and maintained, there is no basis in the present Clean Air Act for forcing further technological developments. Agency review assures that variances granted under § 110 (a)(3) will be consistent with the § 110 (a)(2)(A) requirement that the national standards be attained as expeditiously as practicable and maintained thereafter. Thus § 110 (a)(3) variances *ex hypothesi* do not jeopardize national standards, and the technology-forcing character of the Amendments is no reason at all for judging them under the provisions of § 110 (f).

The First Circuit also rejected the Agency's contention that variances could be handled under the revision procedure, *supra,* at 72–73, but it did so for reasons different from those relied upon by the Fifth Circuit.[26]  It stated:

"Had Congress meant [§ 110 (f)] to be followed only if a polluter, besides violating objective state

[26] The First Circuit's decision was strongly criticized in Comment, Variance Procedures under the Clean Air Act: The Need for Flexibility, 15 Wm. & Mary L. Rev. 324 (1973). The Comment was especially concerned with the conclusion that § 110 (f) was the exclusive postattainment variance mechanism, focusing on this conclusion's lack of support in the statute and legislative history, on its inconsistency with other provisions of the statute, and on its untoward results. A second commentator, writing prior to any of the Court of Appeals decisions, reached conclusions similar to those we today express. Luneburg, Federal-State Interaction under the Clean Air

> requirements, was shown to be preventing mainte-
> nance of a national standard, it would have said so.
> To allow a polluter to raise and perhaps litigate that
> issue is to invite protracted delay. The factual
> question could have endless refinements: is it the
> individual variance-seeker or others whose pollution
> is preventing maintenance of standards? *See e. g.,*
> Getty Oil Company v. Ruckelshaus, 342 F. Supp.
> 1006 (D. Del. 1972), remanded with directions, 467
> F. 2d 349 (3rd Cir. 1972), . . . where *Getty* raised
> this issue in various forums." 478 F. 2d, at 886.

Respondents also stress this argument: treating var-
iances as revisions rather than as postponements would
invite litigation, would be impractical in application, and
would therefore result in degradation of the environment.
Aside from the fact that it goes more to the wisdom of
what Congress has chosen to do than to determining
what Congress has done, we believe this argument to be
overstated. As made clear in the *Getty* case cited by the
First Circuit, a polluter is subject to existing requirements
until such time as he obtains a variance, and variances
are not available under the revision authority until they
have been approved by both the State and the Agency.
Should either entity determine that granting the vari-
ance would prevent attainment or maintenance of na-
tional air standards, the polluter is presumably within his
rights in seeking judicial review. This litigation, how-
ever, is carried out on the polluter's time, not the public's,
for during its pendency the original regulations remain
in effect, and the polluter's failure to comply may subject
him to a variety of enforcement procedures.[27]

Amendments of 1970, 14 B. C. Ind. & Com. L. Rev. 637 (1973).
(At the time he wrote this article, Mr. Luneburg was an attor-
ney in the Enforcement Division, Environmental Protection Agency,
Region I.)

[27] Emission limitations contained in an implementation plan may

We are further impressed that the Agency itself has displayed no concern for the purported administrative difficulty of treating variances as revisions. Ordinarily, an agency may be assumed capable of meeting the responsibilities which it contends are placed upon it. Were respondents able to make a contrary showing, that fact might have some weight in interpreting Congress' intent, although we would doubt its relevance unless Congress were also shown to have been aware of the problem when it drafted legislation which otherwise is consistent with the Agency's contentions. Respondents have made no such showings. The judgments which the Agency must make when passing on variances under § 110 (a)(3) are whether the ambient air complies with national standards, and if so whether a proposed variance would cause a plan to fail to insure maintenance of those standards. These judgments are little different from those which the Agency had to make when it approved the initial plans into which respondents seek to have the States frozen. In each instance the Agency must measure the existing level of pollution, compare it with the national standards, and determine the effect on this comparison of specified emission modifications.[28] That Congress is of the opinion

---

be enforced in several ways. Aside from whatever state procedures are available under the plan, § 113 of the Clean Air Act, as added, 84 Stat. 1686, and amended, 88 Stat. 259, 42 U. S. C. § 1857c-8 (1970 ed., Supp. IV), imposes a duty of enforcement on the Agency. The Agency may issue compliance orders (the violation of which carries severe monetary penalties), or it may bring civil actions for injunctive relief. In addition, § 304 of the Clean Air Act, as added, 84 Stat. 1706, 42 U. S. C. § 1857h–2, provides for citizen suits against any person alleged to be in violation of an emission limitation, and against the Administrator where he is alleged to have failed to perform a nondiscretionary act. Plaintiffs in such actions may be awarded attorneys' fees. § 304 (d).

[28] We recognize that numerous applications for changes of a specific nature have a potential for creating a different kind of problem from

that the Agency can feasibly and reliably perform these functions is manifest not only in its 1970 legislation, but also in a 1974 amendment designed to conserve energy. The amendment provides that the Agency should report to each State on whether its implementation plan could be revised in relation to fuel burning stationary sources, *"without interfering with the attainment and maintenance of any national ambient air quality standard."* § 110 (a)(3)(B) of the Clean Air Act, as added, 88 Stat. 256, 42 U. S. C. § 1857c–5 (a)(3)(B) (1970 ed., Supp. IV). (Emphasis added.)

V

Respondents have put forward several additional arguments which have not been specifically adopted by any court of appeals. The first is based on legislative history. Respondents focus on the fact that while the Conference Committee accepted the Senate's concept of a three-year maximum deadline for attainment of national standards,

that posed by the formulation of general regulations. Such a problem would arise when the grant of a variance to one source would not affect national standards, but the simultaneous or subsequent grant of similar variances to similar sources could result in the plan's failure to insure the attainment and maintenance of the standards. As we have noted in the text, however, the Agency charged with the administration of the Act, and made ultimately responsible for the attainment and maintenance of the national standards, does not view this problem as anywhere near insurmountable. Variances under § 110 (a)(3) cannot be granted until first the State, and then the Agency, have determined that they will not jeopardize the standards. We cannot and do not attempt to foresee, at this stage in the administration of the statute, all of the questions, to say nothing of the answers, that may arise in the allocation of a limited number of available variances. The fact that the interpretation placed on the section by the Agency may on occasion require administrative flexibility and ingenuity to a greater degree than would a more rigid alternative is not, of course, a reason for rejecting the Agency's otherwise reasonable construction.

it also strengthened the Senate's provision by specifying that attainment should be achieved *"as expeditiously as practicable* but . . . in no case later than three years." (Emphasis added.) Respondents further make the contention that the Conference Committee altered the Senate's version of the postponement provision to "provide that a source's attempt to delay compliance with *'any* requirement' of a State Plan would be considered a 'postponement.' " Brief for Respondents 36. According to respondents the latter change "was necessary to conform" the postponement provision with the Conference Committee's "as expeditiously as practicable" requirement.[29]

---

[29] Compare the language of § 110 (f), *supra*, at 75–76, and n. 14, with that of the Senate's proposed § 111 (f), n. 18, *supra*. In light of our textual comments concerning respondents' interpretation of the Conference Committee's changes, we think that a considerably simpler and more satisfactory explanation is available. The most substantial difference between the two, other than the forum for decision, would have been that § 110 (f) is triggered by an application filed prior to the date of compliance with any requirement of a plan, whereas § 111 (f) is triggered by a filing at least a year prior to the deadline for attainment. The Conference Committee's change can be quite reasonably viewed as a recognition that the extreme circumstances justifying breach of the national standards could be present with respect to a requirement taking effect either before or after the attainment date. That might occur, for example, if technological difficulties should prevent required preattainment construction of necessary abatement equipment, or if increasing population density should eventually cause more stringent limitations to be necessary to maintain the national standards. Once it is determined that postponements should be available with regard to any requirement of a plan, and not merely to those tied directly to the attainment date, then the change from "region" and "person or persons" to "any stationary source or class of moving sources" follows rather naturally. The latter phrase is far more convenient for use in conjunction with "any requirement of an applicable implementation plan," yet is not significantly more or less inclusive than the former (while the final version requires source-by-source postponements, and does not provide for relief with respect to

The argument is that because any variance would delay attainment of national standards beyond the date previously considered the earliest practicable, and that because the Act requires attainment as soon as practicable, any variance must therefore be treated as a postponement. This argument is not persuasive, for multiple reasons.

First, this interpretation of the Conference Committee's work finds no specific support in legislative documents or debates. This is true despite the significance of the change which, under respondents' interpretation, was made—the expansion of § 110 (f) from a safety valve against mandatory deadlines into the exclusive mechanism by which a State could make even minor modifications of its emission limitations mix. Respondents' interpretation arises instead from their own reading of the statute and inferences as to legislative purpose. Second, as we have already discussed, and contrary to respondents' contention, § 110 (f) simply does not state that any deferral of compliance with "any requirement" of a state plan "would be considered a postponement." Rather, it merely states that a postponement *may* be sought with respect to any source and any requirement.

Third, respondents' reading equates "practicable" in § 110 (a)(2)(A) with § 110 (f)'s "essential to national security or to the public health or welfare." Yet plainly there could be many circumstances in which attainment in less than three years would be impracticable, and thus not required, but in which deferral could not possibly be justified as essential to the national security, or public

---

an entire region, that requirement was in any event implicit in proposed § 111 (f)(4)'s conditions for granting relief; and while "class of moving sources" is less inclusive than "person or persons," the restriction is not only sensible in light of the small emissions from any single moving source, but it also has no discernible relevance to our inquiry).

health or welfare.[30] Fourth, the statute requires only attainment as expeditiously as practicable, not attainment as expeditiously as was *thought* practicable when the initial implementation plan was devised. Finally, even if respondents' argument had force with regard to a preattainment variance, it would still be of no relevance whatsoever once the national standards were attained. A variance which does not compromise national standards that have been attained does no damage to the congressional goals of attaining the standards as expeditiously as practicable and maintaining them thereafter.

The last of respondents' arguments which merit our attention is related to the Fifth Circuit's conclusion that revisions are restricted to general requirements, and that all specific modifications must therefore be funneled through the postponement provision. Respondents go one step further and contend that the revision authority is limited not only to general changes, but to those which also are initiated by the Agency in order to "accelerate abatement or attain it in greater concert with other national goals." Brief for Respondents 26. This highly restrictive view of § 110 (a)(3) is based on § 110 (a) (2)(H),[31] which specifies that to obtain Agency approval

---

[30] Whether the Georgia variance provision meets the practicability standard with regard to preattainment variances is a different issue. It authorizes variances on the basis of conditions beyond the control of the persons involved, on the basis of circumstances which would render strict compliance "unreasonable, unduly burdensome, or impractical," on the basis of findings that strict compliance would result in substantial curtailment or closing down of business operations, and because alternatives are not yet available. See n. 6, *supra*. Respondents, however, did not attack the Georgia variance procedure on this more limited ground, and we need not consider the issue.

[31] See n. 2, *supra*.

a State's plan must provide a mechanism for revision to take account of revised national standards, of more expeditious methods of achieving the standards, and of Agency determinations that a plan is substantially inadequate.

The argument is specious. Section 110 (a)(2)(H) does nothing more than impose a minimum requirement that state plans be capable of such modifications as are necessary to meet the basic goal of cleansing the ambient air to the extent necessary to protect public health, as expeditiously as practicable within a three-year period. The section in no way prevents the States from also permitting ameliorative revisions which do not compromise the basic goal. Nor does it, by requiring a particular type of revision, preclude those of a different type. As we have already noted, § 110 (a)(3) requires the Agency to approve "any revision" which is consistent with § 110 (a)(2)'s minimum standards for an initial plan, and which the State adopted after reasonable public notice and hearing; no other restrictions whatsoever are placed on the Agency's duty to approve revisions.[32]

## VI

For the foregoing reasons, the Court of Appeals for the Fifth Circuit was in error when it concluded that the postponement provision of § 110 (f) is the sole method by which may be obtained specific ameliorative modifica-

---

[32] Respondents also claim that their view of revisions is supported by the context in which the term is used in other parts of the amended Act. We disagree. Two instances, §§ 110 (a)(2)(A)(i) and 110 (c)(1)(C), are references to the revision mechanism required by § 110 (a)(2)(H), but do not suggest that there may not also be other types of revisions. The other two, §§ 110 (a)(1) and 110 (d), are entirely neutral both in terms of whether revisions are specific or general and in terms of whether they may occur independently of § 110 (a)(2)(H).

tions of state implementation plans. The Agency had properly concluded that the revision mechanism of § 110 (a)(3) is available for the approval of those variances which do not compromise the basic statutory mandate that, with carefully circumscribed exceptions, the national primary ambient air standards be attained in not more than three years, and maintained thereafter. To the extent that the judgment of the Court of Appeals for the Fifth Circuit was to the contrary, it is reversed and the cause is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

MR. JUSTICE DOUGLAS dissents.

MR. JUSTICE POWELL took no part in the consideration or decision of this case.