# Applicability of the Architectural Barriers Act of 1968 to Buildings Financed with Federal Funds

Architectural Barriers Act of 1968 applies only where federal grants or loans are used to finance the design, construction, or alteration of a building, and does not apply where a building is merely leased with federal funds.

While the text and legislative history of the 1968 Act are ambiguous as to whether its applicability depends on actual issuance of standards for design, construction, or alteration, both subsequent amendments to the Act and consistent administrative interpretation—support the conclusion that the Act applies if such standards are authorized under the law authorizing the grant or loan, even if they have not been issued.

May 8, 1980

## MEMORANDUM OPINION FOR THE ASSISTANT ATTORNEY GENERAL, CIVIL RIGHTS DIVISION

This responds to your memorandum requesting this Office to resolve questions that have arisen concerning the scope of § 1 of the Architectural Barriers Act of 1968 (Act), 42 U.S.C. § 4151. Attached to your memorandum were memoranda of the General Counsel of the Department of Health, Education and Welfare (HEW) and the General Counsel of the Architectural and Transportation Barriers Compliance Board (ATBCB), presenting their respective positions. As set forth in the cover letters attached to their memoranda, the questions on which HEW and ATBCB have agreed to request our opinion are: (1) whether the Act extends to buildings leased by a recipient of a federal grant or loan where the recipient uses the federal funds to make rental payments; and (2) whether the Act covers only those buildings for which standards for design, construction, or alteration actually have been imposed, either by statute or by regulation. For the reasons set forth below, we conclude that the Act covers those buildings for which standards are authorized, even if they have not actually been imposed, but that the Act does not extend to buildings leased by recipients of federal grants or loans where the funds were not made available for building construction or alteration.

Before considering the particular statute in question, it is necessary briefly to review the history and purpose of the Act, and subsequent

legislative developments.[1] Enacted in 1968, the Act was designed to insure that all buildings "constructed in the future by or on behalf of the Federal Government or with loans or grants from the Federal Government are designed and constructed in such a way that they will be accessible to and usable by the physically handicapped." S. Rep. No. 538, 90th Cong., 1st Sess. 2 (1967). In § 2, it authorized the Administrator of General Services, in consultation with the Secretary of HEW, to prescribe such standards for the design, construction, and alteration of buildings as may be necessary to insure that physically handicapped persons will have ready access to, and use of, such buildings.[2] After the effective date of a standard issued under the Act, every building subject to the Act was required to be designed, constructed, or altered in accordance with such standard.[3] For purposes of the Act, the word "building" was defined as follows:

> [T]he term "building" means any building or facility . . . the intended use for which either will require that such building or facility be accessible to the public, or may result in the employment or residence therein of physically handicapped persons, which building or facility is—
> (1) to be constructed or altered by or on behalf of the United States;
> (2) to be leased in whole or in part by the United States after the date of enactment of this Act after construction or alteration in accordance with plans and specifications of the United States; or
> (3) to be financed in whole or in part by a grant or a loan made by the United States after the date of enactment of this Act if such building or facility is subject to standards for design, construction, or alteration issued under authority of the law authorizing such grant or loan.

Architectural Barriers Act, § 1, 82 Stat. 718 (1968) (current version at 42 U.S.C. § 4151).

In 1970, the Act was amended to include the buildings and structures constructed by the Washington Metropolitan Transit Authority. Act of March 5, 1970, 84 Stat. 49 (codified at 42 U.S.C. § 4151). Because the Transit Authority is a regional agency formed by compact and not a

---

[1] For an analysis of the legislative history of the Act and its implementation, see Minority Staff of Senate Comm. on Environment and Public Works, 96th Cong., 1st Sess., Architectural Barriers In Federal Buildings (Comm. Print 1979).

[2] 82 Stat. 719 (1968). There were two exceptions to § 2. For residential structures subject to the Act, the Secretary of Housing and Urban Development was authorized to prescribe standards. See Architectural Barriers Act, § 3, 82 Stat. 719 (1968) (current version at 42 U.S.C. § 4153). For facilities of the Department of Defense subject to the Act, the Secretary of Defense was authorized to prescribe standards. Id. at § 4, 82 Stat. 719 (1968) (current version at 42 U.S.C. § 4154). Both officials were directed to consult with the Secretary of HEW.

[3] Architectural Barriers Act, § 5, 82 Stat. 719 (1968) (codified at 42 U.S.C. § 4155). The Act did allow exceptions to be made in some circumstances. Id., § 6, 82 Stat. 719 (1968) (current version at 42 U.S.C. §4156).

federal agency, and because its buildings are not subject to regulation for design, construction, or alteration issued under authority of the law authorizing federal funds, the question arose whether it was covered by the Act. S. Rep. No. 658, 91st Cong., 2d Sess. 2 (1970). The amendment was passed to clarify the Act by clearly including the Washington subway system.[4]

As a result of a report by the General Accounting Office,[5] the Act again was amended in 1976 to "assure more effective implementation of the congressional policy to eliminate architectural barriers to physically handicapped persons in most federally occupied or sponsored buildings." H.R. Rep. No. 1584—Part I, 94th Cong., 2d Sess. 1 (1976). The amendment changed the law by extending its coverage to include the United States Postal Service; buildings privately owned, but used to provide public or federally subsidized housing; and all buildings to be leased in whole or in part by the United States. It also removed some of the discretionary authority of the administrative agencies. *See* Public Buildings Cooperative Use Act of 1976, § 201, 90 Stat. 2507 (codified at 42 U.S.C. §§ 4151–4156).

Since the passage of the Architectural Barriers Act, other steps have been taken by the federal government to eliminate architectural barriers in public buildings. In 1973, Congress passed the Rehabilitation Act, Pub. L. No. 93–112, 87 Stat. 355, an extensive revision of statutes dealing with vocational rehabilitation. Two of its provisions are relevant to the questions presented here. Section 502 of the Rehabilitation Act established the ATBCB to insure compliance with standards prescribed pursuant to the Architectural Barriers Act. 87 Stat. 391–393 (current version at 29 U.S.C. § 792). According to the Senate Labor and Public Welfare Committee, a new federal board was needed "to insure compliance with the present Federal statutes regarding architectural barriers since compliance has been very spotty and there is no such comparable compliance unit in existence. . . ." S. Rep. No. 318, 93d Cong., 1st Sess. 49 (1973). As amended by subsequent legislation, § 502 now provides that it is the function of the ATBCB to insure compliance with the standards prescribed pursuant to the Architectural Barriers Act, including enforcing all standards under that Act and establishing minimum guidelines and requirements for such standards. 29 U.S.C. § 792(b)(1)–(7). In carrying out its functions, the Board may issue orders of compliance, including the withholding or suspension of federal funds with respect to any building found not to be in compliance with standards being enforced. 29 U.S.C. § 792(d)(1).

---

[4] The amendment added subparagraph (4) to the definition of "building" in 42 U.S.C. § 4151. As used in the Act, "building" thus included any building or facility "to be constructed under authority of the National Capital Transportation Act of 1960, the National Capital Transportation Act of 1965, or title III of the Washington Metropolitan Area Transit Regulation Compact."

[5] Report of United States Comptroller General, "Further Action Needed to Make All Public Buildings Accessible to the Physically Handicapped" (July 15, 1975).

Section 504 of the Rehabilitation Act provided that "[n]o otherwise qualified handicapped individual in the United States . . . shall, solely by reason of his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 87 Stat. 394 (codified at 29 U.S.C. § 794). Executive Order No. 11914, issued in 1976, directs the HEW Secretary to coordinate the implementation of § 504 by all federal departments and agencies empowered to extend financial assistance to any program or activity. Exec. Order No. 11914, 45 C.F.R. Part 85 App. A (1979). The order also directs the Secretary to establish guidelines for agency standards for determining what are discriminatory practices, and, if voluntary compliance cannot be secured informally, authorizes the suspension or termination of financial assistance. Section 5 of the executive order authorizes the Secretary to adopt rules to carry out the Secretary's responsibilities. The rules so adopted require in part that a program recipient's facilities be accessible to handicapped persons. 45 C.F.R. § 85.56–85.58. Thus, although the executive order requires the Secretary to insure that HEW regulations are not inconsistent with or duplicative of other federal policies relating to the handicapped (including the Architectural Barriers Act), HEW and ATBCB do have overlapping jurisdiction as to certain aspects of federal programs and activities. The questions presented here, which arise out of those agencies' conflicting interpretations of the Architectural Barriers Act, do not directly address that overlapping jurisdiction. Resolution of those questions, however, will determine the scope of the Act and, hence, the scope of ATBCB's derivative jurisdiction.

Both of the questions presented here require an interpretation of subparagraph (3) of 42 U.S.C. § 4151. That subparagraph provides that the term "building" means any building or facility "to be financed in whole or in part by a grant or a loan made by the United States after August 12, 1968, if such building or facility is subject to standards for design, construction, or alteration issued under authority of the law authorizing such grant or loan." The first question we address is whether the quoted phrase includes buildings leased with federal funds by grant or loan recipients of the federal government. To include such buildings, the phrase "financed in whole or in part by a grant or a loan" must be found to include payments of rent to owners of buildings leased by grant or loan recipients. The plain language of the statute as well as its legislative history make clear that the Act does not reach so far.

## I.

In common usage, "financing" a building generally refers to the method of payment for purchase of the building or the labor and materials needed to construct or alter it. The phrase "financed in whole

or in part" appeared in both the House and Senate versions of the bill. The Senate version provided that the term "public building" means any non-residential building "financed in whole or in part with funds provided by a grant or loan made by the Federal Government." S. 222, 90th Cong., 1st Sess. (1967).[6] The amended House version, H.R. 6589, contained the language which eventually became § 4151. Because of conflicting language in the two bills, a conference committee was convened. 114 Cong. Rec. 20,683 (1968). The conference committee recommended that the House version be passed with one amendment not relevant here. H.R. Rep. No. 1787, 90th Cong., 2d Sess. 1 (1968). This recommendation was agreed to in both Houses. 114 Cong. Rec. 23,722, 24,038 (1968).

Hearings were held by both House and Senate committees. Throughout these hearings, as well as throughout the reports of the congressional committees, it is apparent that this legislation was intended to cover construction of new buildings or planned alteration of existing buildings. There is no indication that it alone was meant to trigger alterations of existing buildings, whether owned by the federal government, leased by the federal government, or owned or leased by recipients of federal funds. In the Senate hearings on S. 222, the sponsor of the bill, Senator Bartlett, testified as follows:

> S. 222 is a simple bill. It seeks only to require that public buildings constructed with Federal funds, whether by or on behalf of the Federal Government or through a grant or loan to some other organization, be designed in such a manner that they be accessible to all the public, including the physically handicapped. I would emphasize here that I would be opposed to amendment to this bill requiring alteration of existing public buildings. Such a program would be, in my view, too expensive to undertake at this time. It is my belief that existing access problems which need remedial action should be taken up on a case-by-case basis.

*Accessibility of Public Buildings to the Physically Handicapped: Hearings on S. 222 Before the Subcomm. on Public Buildings and Grounds of the Sen. Comm. on Public Works,* 90th Cong., 1st Sess. 3 (1967). If "financed" included leasing, the Act would require massive and costly alterations in the many buildings leased or to be leased by recipients of federal funds, contrary to the sponsor's intent. Other statements made at Senate hearings also imply that the Act does not include leased buildings. A representative of the Department of Housing and Urban Development testified that the bill would cover "all contracts for the

___

[6] The Senate unanimously passed S. 222 in 1967. 113 Cong. Rec. 24,133 (1967). The House did not act on either S. 222 or its own bill, H.R. 6589, until 1968.

construction of public buildings, and all grants or loans made by the Federal Government or any department or agency thereof *for the purpose of financing the construction of public buildings. . . ."* [7] *Id.,* at 52 (emphasis added). Another witness urged that the words "alter" and "remodel" be included in S. 222 so that the bill would not be limited to new construction but "would also result in causing existing structures to conform to architectural barrierless standards *as changes are made in such structures." Id.,* at 84. (Statement of J.F. Nagle.) Reference to "alteration" subsequently was added to the bill.

Nor do statements made by witnesses at the House hearings on H.R. 6589 and S. 222 disclose any belief that the Act would require recipients of federal funds to lease only accessible buildings. Senator Bartlett repeated that it would only apply to those buildings "to be built in the future." *Building Design for the Physically Handicapped: Hearings on H.R. 6589 and S. 222 Before the Subcomm. on Public Buildings and Grounds of the House Comm. on Public Works [House Hearings],* 90th Cong., 2d Sess. 5 (1968). Congressman Bennett, the sponsor of H.R. 6589, stated that the legislation "would insure that public buildings financed with public funds be designed to be accessible. . . ." *Id.,* at 7. The entirety of his brief testimony indicates his understanding that "financed" refers to construction or alteration and not to making rental payments. He emphasized the possible cost savings for "construction and design of buildings," and the cruelty of continuing "to approve plans for public buildings" which are inaccessible to the handicapped. *Id.* In discussing the definition of "public building" financed with federal funds, Representative Grover used the example of a small business which gets a loan to construct a small factory, and even including this, he suggested, may reach too far. *Id.,* at 35.

The conclusion that the term "financing" refers to financing the *construction* of a building also finds support in the committee reports. In the Senate report, the Committee summary of the bill states that S. 222 will require "that grants or loans made by the Federal Government *for the purpose of financing the construction of public buildings* be made upon the condition that the design and construction of such buildings shall comply with the regulations." S. Rep. No. 538, 90th Cong., 1st Sess. 1–2 (1967) (emphasis added). The report stated that the legislation was necessary "to insure that all public buildings constructed in the future by or on behalf of the Federal Government or with loans or grants from the Federal Government" are designed to be accessible. *Id.,* at 2. The House report on H.R. 6589 [H.R. Rep. No. 1532, 90th Cong., 2d Sess. 2–3 (1968)] and the congressional debates reveal the same intent. For example, Representative Cleveland, a co-sponsor of H.R. 6589, stated: "It would not require alteration of already existing buildings,

---

[7] The word "public" in the term "public building" in S. 222 was deleted when the conference adopted the House language.

except to set design standards if alterations were undertaken anyway." ·114 Cong. Rec. 17,432 (1968).

The difficulty in applying subparagraph (3) to leases by loan or grant recipients is compounded by the second phrase of that paragraph which provides that buildings financed with federal funds are included only "if such building or facility is subject to standards for design, construction, or alteration issued under authority of the law authorizing such grant or loan." If the extent of federal involvement is the grant or loan of program funds used solely to lease a building or facility, it is highly improbable that the law authorizing the grant or loan would authorize issuance of standards for design, construction, or alteration of the building.

The treatment in § 4151 of buildings leased directly by the federal government also indicates that the Act does not cover buildings leased with loan or grant money. H.R. 6589, as amended in the second session of the 90th Congress, provided that the term "building" would include buildings "leased in whole or in part by the United States after the date of enactment of this Act after construction or alteration in accordance with plans and specifications of the United States." This language was adopted by the conference committee [8] and became subparagraph (2) of § 4151.[9] The House report explains that this language includes buildings "to be leased and constructed or altered pursuant to plans and specifications specified by the Federal Government. . . ." H.R. Rep. No. 1532, 90th Cong., 2d Sess. 3 (1968).

In the early versions of S. 222 and H.R. 6589, leasing was not specifically mentioned. At the House hearings, Representative Grover asked Senator Bartlett the following question: "In view of the language in the bill, Senator, do you think that in (1)(a) where you talk about public buildings being constructed by or on behalf of the Federal Government, do you think that is broad enough to take in the wide range of leasing arrangements that the Federal Government has with respect to Federal Government buildings?" The Senator responded: "I should hope that the regulations of the General Services Administrator would make that abundantly clear. But if there is any doubt, sir, I would favor writing it into the language of the act." House Hearings, *supra* at 6. Representative Grover's question prompted additional discussion of the leasing question. During the testimony of William Schmidt, a representative of the General Services Administration, the following colloquy occurred between Mr. Schmidt and Representative Gray:

> Mr. Gray: I notice on page 2 of your statement, you say:
> Thus, the legislation encompasses not only buildings con-

---

[8] H.R. Conf. Rep. 1787, 90th Cong., 2d Sess. 1 (1968).

[9] 82 Stat. 718 (1968). This section was amended in 1976. See n. 10 *infra*.

structed by GSA under the provisions of the Public Buildings Act of 1959, but all structures which must be used by the public and which are financed at least in part by Federal funds.

Did you hear the question that was propounded to Senator Bartlett when we asked him if he felt that Post Office buildings and other projects, wholly owned by private enterprise, but leased to the Federal Government would be covered under the existing bill; or is it your feeling that we should tighten it up so as to make that clearer?

Mr. Schmidt: I think the language is susceptible to the interpretation that it includes leased buildings, that is, buildings leased in whole by the Government. But I do not believe this is clear in the Senate Report No. 538 that the bill was intended to cover these facilities.

I think it is quite to the contrary.

Mr. Gray: Do you think it should be written into the law, or do you think it could be covered adequately in the House report?

Mr. Schmidt: Actually I would see no objections to the inclusion of leased buildings, that is buildings leased by the Government, to be constructed or under construction, or altered. In fact we are beginning to include this requirement in our leasing procedures on all buildings to be constructed.

Mr. Gray: Do you think adding the word "leased" would cover it?

Mr. Schmidt: I think it would take some additional language to cover the leased facilities so that it would be without question.

*Id.,* at 13. At the end of this discussion, Mr. Schmidt agreed to provide to the committee some statutory language "to make sure that leased buildings, Post Office and otherwise, are going to be covered the same as Government-owned buildings." *Id.,* at 15. During the subsequent House debate on H.R. 6589, which then had been amended to include reference to federal leasing, Representative Gross asked if that language, subparagraph 2, would cover "the lease-purchase post offices presently being built throughout the country." Representative Gray responded: "I would say . . . that we did admonish the people downtown to go back and eliminate those barriers which are necessary if we already have the building under lease. And, if it is a new building to be leased, we make it mandatory that the provisions of this bill be carried out." 114 Cong. Rec. 17,431 (1968).

It is clear from these discussions that the Congress considered the question of leased buildings. It is also clear that they felt that the language did not clearly cover leased buildings. Accordingly, they added language which unmistakably included buildings to be leased by the federal government if such buildings were to be constructed or altered in accordance with plans and specifications of the United States. They went no further. Congress made no amendment to include buildings leased with grant or loan money if that money was not used to finance construction or alteration of the building.[10]

A review of the committee hearings, the committee reports and the floor debates reveals the overwhelming support for the goals of this Act. In the House report, for example, the committee stated: "If people who are physically handicapped are to rehabilitate themselves and seek gainful employment, it is vitally necessary that they have access to and are able to use buildings in which they work, visit, and reside in carrying on a normal life." H.R. Rep. No. 1532, 90th Cong., 2d Sess. 3–4 (1968). Representative Gray, after noting that H.R. 6589 had received "unanimous support from Members on both sides of the aisle," reminded his colleagues that the voluntary efforts of the federal agencies had fallen short and needed to be supplemented by minimum mandatory standards. 114 Cong. Rec. 17429–30 (1968). And the committees emphasized that the purpose of the Act was not to be circumvented by a narrow administrative interpretation of the word "building" by clearly stating their intent: "It is the intent of the committee that the word 'building' as used in this bill be given the broadest possible interpretation and include any structure which may be used by the general public, whether it be a small rest station at a public park or a multimillion-dollar Federal office building." H.R. Rep. No. 1532, 90th Cong., 2d Sess. 4 (1968); S. Rep. No. 538, 90th Cong., 1st Sess. 3 (1967). We believe that the conclusion reached here is consistent with and furthers legislative intent, although it is a more restrictive interpretation as to the number of structures to which the Act applies. In our opinion, the language directing a broad interpretation of the word "building" refers to the type of structure, not to the leasing or financing arrangement. The examples given in the sentence quoted above support this conclusion, as do excerpts from the congressional hearings. One witness, for example, urged that the definition of "building" be broad enough to include such buildings and facilities as national monuments, parking lots, and border immigration stations. House Hear-

---

[10] In 1976, subparagraph (2) of § 4151 was amended to delete the phrase "after construction or alteration in accordance with plans and specifications of the United States." Act of Oct. 18, 1976, § 201(1), 90 Stat. 2507. See also H.R. Rep. No. 1584—Part I, 94th Cong., 2d Sess. 12 (1976). The Act now includes within the meaning of the word "building," therefore, a building or facility "to be leased in whole or in part by the United States after August 12, 1968." 42 U.S.C. § 4151. Thus, it was not until 1976 that the Congress chose to include under the Act even those buildings leased directly by the federal government itself.

ings at 53 (statement of Heyward McDonald, Chairman, National Commission on Architectural Barriers to Rehabilitation of the Handicapped). In our opinion, it is clear from the statute and its legislative history that buildings leased with federal grant or loan funds are not covered by the Act.[11]

## II.

The second issue raised also requires careful analysis of subparagraph (3) of § 4151. A building financed by a federal grant or loan is subject to the Act only if such building or facility is "subject to standards for design, construction, or alteration issued under authority of the law authorizing such grant or loan." 42 U.S.C. § 4151. The question presented here is whether applicability of the Act depends on actual issuance of the standards, or if the Act is applicable even if such standards, although authorized, have not been issued. The statutory language is ambiguous, and reasonable persons could interpret it differently. It does state that a structure is included only if it "is" (not "may be") subject to standards "issued" (not "issuable") under the authority of the law authorizing the grant or loan. On the other hand, it could be read to provide that a building is included if it is "subject" to standards issued under the law. That is, if the law authorizes standards to be imposed, the building could be considered to be "subject" to standards issued under the law in question.

The congressional intent underlying its language is difficult to discern. The phrase which imposes the condition that standards be issued did not appear in the Senate version of the bill, S. 222, or in the early House version. *See* H.R. 6589, 90th Cong., 1st Sess. (1967).[12] During the House hearings, concerns were expressed which may have caused the language in question to be added. Questions arose, for example, regarding the potentially overbroad definition of "public building." During the testimony of William A. Schmidt, a representative of the General Services Administration (GSA), Representative Waldie asked whether a local project financed primarily by local funds, but which also received generous federal subsidies, would fall within the purview of the legislation. House Hearings at 17. Neither Mr. Schmidt nor Representative Gray, Chairman of the Subcommittee, could answer the question. Representative Gray did state, however: "I doubt it seriously in this legislation. We only have jurisdiction over public buildings and

---

[11] The memorandum submitted to us by the ATBCB, which is responsible for enforcement of the Act, argues that the term "financed" includes leasing. Although the interpretation of the enforcing agency must be given due deference (*see* p. 17, *infra*), it should not be followed if it is clearly erroneous.

[12] As defined in those bills, the term "public building" included simply any building "financed in whole or in part with funds provided by a grant or loan made by the Federal Government, or any department or agency thereof after the date of enactment of this Act." The adjective "public" was later deleted.

622

grounds." *Id.* Mr. Schmidt then opined: "The bill is confined to public buildings as defined in the bill and would not cover federally subsidized public facilities." *Id.* Later, Representative Grover again raised the issue of the scope of the definition, suggesting that some restrictive language might be appropriate. *Id.* at 35. Representative Gray joined Representative Grover in his inquiry whether certain public buildings, included in the broad definition in the bill, properly would lie in another legislative jurisdiction. *Id.* For example, some federally assisted programs, such as Department of Agriculture construction programs, hospital construction, and airport construction, would lie with legislative committees other than the Committee on Public Works. Representative Denney suggested that the ambiguity could be obviated by deleting entirely the section of the definition which included buildings financed with grant or loan funds. *Id.,* at 36–37. This suggestion was criticized by subsequent witnesses who felt it substantially would weaken the bill. *Id.* at 53, 69, 91 (Statements of Heyward McDonald, William McCahill, and Representative James H. Scheuer).

These questions were not resolved during the hearings. Subsequently, the committee added the language in question, conditioning coverage of the Act on whether the building is subject to standards issued under the law authorizing the grant or loan. H.R. Rep. No. 1532, 90th Cong., 2d Sess. 1 (1968). It is possible that the language was intended to minimize potential legislative jurisdictional conflict by limiting imposition of accessibility standards to those situations in which the Congress specifically authorizes construction or design standards to be imposed.

The committee reports and the floor discussion of the bill provide little additional guidance on interpreting this section. The House report does suggest that standards actually must be imposed, by paraphrasing the language as follows: "[T]he committee amended the legislation to include any . . . building or facility . . . financed with funds provided by a Federal grant or loan, if the recipients are *required* by the basic legislation governing the grant or loan to adhere to regulations establishing standards for design, construction, and alterations. . . ." H.R. Rep. No. 1532, 90th Cong., 2d Sess. 3 (1968) (emphasis added). It can be inferred from remarks on the floor, however, that Congress assumed that the Act would apply to all construction for which standards *could* be imposed. Several speakers broadly stated that the bill was to reach all buildings without indicating that any discretion was left in the agencies. 114 Cong. Rec. 17,429–32 (1968) (remarks of Representatives Gray, Fulton, Matsunaga, and Bennett). If an agency has discretion as to whether to issue standards, then reading the Act to cover only those buildings for which standards have been issued leaves some discretion in the agencies. When Representative Gude asked Representative Gray, Chairman of the Subcommittee, if transit facilities were covered by the

Act, Mr. Gray unequivocally stated: "If constructed with Federal public funds such facilities would be covered." *Id.,* at 17,431.

When interpreting a statute, one may look for guidance to subsequent legislation which may reveal the intent of an earlier statute. *Red Lion Broadcasting Co.* v. *FCC,* 395 U.S. 367, 380–81 (1969). In 1970, as noted earlier, Congress amended § 4151 to include the Washington Metropolitan Transit Authority. Pub. L. No. 91–205, 84 Stat. 49 (1970). The law authorizing Washington Metro construction did not specifically provide that design standards were to be imposed, although the regional agency did have broad power to design, engineer, and construct the system. *See* National Capital Transportation Act of 1965, Pub. L. No. 89–173, § 3, 79 Stat. 664. The system was not, however, actually subject to standards for design issued under the Act. *See Design and Construction of Federal Facilities to be Accessible to the Physically Handicapped: Hearings on H.R. 14464 Before the Subcomm. on Public Buildings and Grounds of the House Comm. on Public Works,* 91st Cong., 1st Sess. 21 (1969).[13] According to the Senate report, this amendment was necessary because the transit authority was a regional agency formed by compact and not a Federal agency, and because "its buildings or structures are not subject to regulation for design, construction, or alteration issued under authority of the law authorizing Federal funds." S. Rep. No. 658, 91st Cong., 2d Sess. 2 (1970). This suggests that mere authorization may not be sufficient. The committee broadly stated, however, that it was the intent of the committee reporting the 1968 Act "that all buildings and structures which are to be used by the general public and are financed in whole or in part with Federal funds be designed and constructed so as to be accessible to the physically handicapped." *Id.* The House report stated that the 1968 Act "made it incumbent upon the Federal Government to insure that all public buildings constructed with Federal funds or constructed on behalf of the Federal Government be constructed in such a way that they are accessible to all people." H.R. Rep. No. 750, 91st Cong., 1st Sess. 1 (1969). The report also stated coverage of the Act was in doubt "[b]y virtue of the unique Federal-State relationship created through the [transit] compact" and implied that the amendment resolves doubt as to the applicability of the Act to mass transit facilities. *Id.,* at 2.

In 1973, the Department of Transportation requested an opinion from the General Services Administration on the applicability of § 4151 to grants and loans to state and local communities by the Urban Mass Transportation Administration for the construction and alteration of mass transit facilities under § 3 of the Urban Mass Transportation Act

---

[13] At the outset of the hearings, Representative Gray, Chairman of the Subcommittee, stated that the legislation became necessary "when we found the original legislation did not include rolling stock." Hearings, at 4. The testimony at the hearings centered on the Act's application to mass transportation systems in general, not on the question of federal imposition of general design standards.

of 1964, 49 U.S.C. 1602. Section 3 authorizes the Secretary of Transportation to make loans or grants to assist in construction of mass transportation facilities "on such terms and conditions as he may prescribe." The GSA concluded that § 4151 is applicable to grants and loans for construction and alteration of buildings and facilities of that kind, if the authorizing legislation is interpreted to permit loans and grants to be subject to design and construction standards.[14] The General Counsel of GSA relied heavily on the 1970 amendment concerning the Washington Metro System, and on the instruction in the legislative history of the Act that the word "building" be broadly interpreted.

This has also been the interpretation of the ATBCB, which in 1973 was given responsibility for enforcing the Act. The Board's proposed regulations provided that the term "building" includes any building financed by a grant or loan if such building "may be" subject to standards for design, construction, or alteration. 41 Fed. Reg. 23,598 (1976). In the final regulations, "may be" was changed to "is," but the Board made clear in its comments that this change was not a change in its interpretation of the statute. It wrote:

> The term "building," § 1150.2(d), has also been revised by deleting the phrase "may be" in (iii) and substituting the word "is" in lieu thereof. One Federal commentator felt that the proposed language might be construed as a substantive change. That was not intended and the change has been made to more closely follow the definition of "building" in Pub. L. No. 90–480. This does not effect any change in interpreting the statute. *See* Opinion of General Counsel, General Services Administration, "First Report of the Architectural and Transportation Barriers Compliance Board" at pages 49–50.

41 Fed. Reg. 55,442 (1976). This has been the consistent interpretation of the Board since it was established.

When a statute has been officially interpreted by those agencies charged with its administration and enforcement, such interpretations must be given due deference. *Griggs* v. *Duke Power Co.,* 401 U.S. 424, 433–34 (1971); *Udall* v. *Tallman,* 380 U.S. 1, 15 (1965); *Norwegian Nitrogen Products Co.* v. *United States,* 288 U.S. 294, 315 (1933). Generally, reasonable interpretations of such agencies are not to be rejected simply because alternative interpretations may be advanced. *Miller* v. *Youakim,* 440 U.S. 125, 144 (1979); *Train* v. *Natural Resources Defense Council, Inc.,* 421 U.S. 60, 87 (1975). In our opinion, the interpretations

---

[14] The letter stated: "Since the applicability of (the Act) is not dependent upon the exercise of discretionary authority by the agency, we also conclude that the Act is applicable, notwithstanding the fact that UMTA, as a matter of policy, may determine not to make such loans and grants subject to design and construction standards not related to the handicapped." (Opinion letter of the General Counsel, GSA (February 14, 1973)).

advanced by GSA and ATBCB are not unreasonable and, for this reason, we conclude that the term "building" covers those buildings or facilities financed by federal grants or loans if the law authorizing the grant or loan also authorizes the issuance of standards for design, construction, or alteration,[15] even if, in its discretion, the agency chooses not to issue such standards.[16]

LEON ULMAN
*Deputy Assistant Attorney General*
*Office of Legal Counsel*

---

[15] We interpret the phrase "standards for design, construction, or alteration" as referring to architectural standards in general, not to accessibility standards in particular.

[16] In reaching the opposite conclusion, HEW argues that the Board's construction raises due process problems because of lack of notice to the program recipients. We do not think the statute is unconstitutionally vague, particularly when the agencies responsible for administering and enforcing the Act officially have taken a consistent position for seven years. A statute is not unconstitutionally vague because it may be ambiguous or open to two constructions. *Williams* v. *Brewer*, 442 F.2d 657, 660 (8th Cir. 1971). It is the responsibility of the Board and the granting agencies to see that recipients are informed of and comply with the Act.