**M.M. & P. MARITIME ADVANCEMENT, TRAINING, EDUCATION & SAFETY PROGRAM (MATES) and Maritime Institute of Technology & Graduate Studies, Appellants,**

v.

**DEPARTMENT OF COMMERCE, INTERNATIONAL TRADE ADMINISTRATION, Appellee.**

No. 83–1130.

United States Court of Appeals, Federal Circuit.

March 5, 1984.

Eugene T. Rossides, Washington, D.C., argued, for appellants. Robert V. McIntyre and George C. Smith, Washington, D.C., were on brief, for appellant.

Velta A. Melnbrencis, New York City, argued, for appellee. With her on brief were J. Paul McGrath, Asst. Atty. Gen. and David M. Cohen, Director, Washington, D.C.

Before RICH, Circuit Judge, SKELTON, Senior Circuit Judge, and KASHIWA, Circuit Judge.

KASHIWA, Circuit Judge.

This is an appeal from the decision of the Secretary of Commerce denying appellants' application for duty-free entry of two shiphandling and navigational simulators pursuant to Item 851.60 Tariff Schedules of the United States (TSUS), added by section 6 of the Educational, Scientific and Cultural Materials Importation Act of 1966.[1] The Secretary denied appellant's application based on his determination that the simulators were not intended to be used in scientific research or formal science-oriented education. We reverse and remand.

I

The Educational, Scientific, and Cultural Materials Importation Act of 1966 (hereinafter the Act) was enacted to implement the Florence Agreement, an international treaty designed to facilitate the free flow of educational, scientific, and cultural materials across national boundaries. S.Rep. No. 1678, 89th Cong., 2nd Sess., *reprinted in* 1966 U.S.CODE CONG. 4 AD.NEWS 3254; H.R.Rep. No. 1779, 89th Cong., 2nd Sess. 6 (1966). (Hereinafter S.Rep. No. 1678 and H.R. No. 1779). The Act accomplishes this purpose by providing for the duty-free importation of educational, scientific, and cultural materials if certain requirements are met. The provision of the Act at issue in this case provides for duty-free entry of:

Articles entered for the use of any non-profit institution, whether public or private, established for educational or scientific purposes:

Instruments and apparatus, if no instrument or apparatus of equivalent scientific value for the purposes for which the instrument or apparatus is intended to be used is being manufactured in the United States (see headnote 6 to this part). [19 U.S.C. § 1202, Schedule 8, Part 4, Item 851.60, of the Tariff Schedules of the United States (TSUS)].

The Act further provides that the Secretary of Commerce shall have responsibility for determining whether an instrument or apparatus of equivalent scientific value to such article, for the purposes for which the instrument or apparatus is intended to be used, is being manufactured in the United States. Headnote 6 to TSUS Schedule 8, part 4.

Appellant, the Masters, Mates and Pilots Maritime Advancement, Training, Education and Safety Program (MATES), is a nonprofit institution which administers the Maritime Institute of Technology and Graduate Studies and which conducts educational and training programs in the field of marine navigation, shiphandling and related fields. These programs are designed to further the education and training of pilots, shipmasters and other licensed deck officers.

On May 8, 1981, MATES filed its initial application for duty-free entry under the Act of a "shiphandling simulator for shiphandling and navigation training" to be used in a shiphandling course. According to the curriculum included in the application, each student was to spend 50% of his time in the classroom and 50% of his time in the simulator. The purpose of the course was to: (1) improve the ability of the merchant officer to plan and execute safe and effective ship operations in the context of realistic situations, (2) cultivate a thorough understanding of the internal and external forces on a ship during navigation, and (3) provide a basis for standard bridge team organization.

Students taking the course were required to understand navigation and radar assessment procedures, the effects of hydrody-

---

**1.** Pub.L. No. 89–651, § 6(c), 80 Stat. 897, 899, 19 U.S.C. § 1202, Schedule 8, Part 4, Headnote 6.

namics on ship performance, and the equations of motion which form the basis for physical phenomena affecting ship motion. Unless a student had taken courses in all-weather and electronic navigation during the prior two years, he would have to take a refresher course in these areas before enrolling in the course. The application also specified the technical features of the simulator which were necessary to achieve appellants' educational objectives.

On January 5, 1982, MATES filed a request for a second "Shiphandling simulator for shiphandling and navigation training", again indicating that the article was intended to be used for educational purposes.

On January 16, 1982, MATES' requests were both denied without prejudice for resubmission. The letter of denial stated:

> (To) permit the determination of scientific equivalency required by Pub.L. 89–651, the application must show a use of the foreign article in scientific research or formal science-oriented education (e.g., courses in chemistry, physics, biology, etc.). ·
>
> The Department concurs with NBS and notes that your purposes appear to be vocational training which cannot be considered scientific research or science oriented education. Thus at this time we are unable to attach any measure of scientific value to the foreign article and therefore find that a prima facie case for a determination relative to scientific equivalency has not been made.

On April 23, 1982, MATES resubmitted its request for duty-free entry with regard to the first article specifying it as a "radio and radar navigational aid apparatus identified as a Ship Operational Research and Educational Facility." The application stated that, although the article would be

principally used for educational purposes, it was also capable of various research applications.[2] A similar application was resubmitted for the second article on January 6, 1983.

On April 19, 1983, the Director of the Office of Import Programs issued his decision denying duty-free treatment in both cases upon the ground that "because the article possesses no scientific value for the purposes for which it is intended, a prima facie case is not presented upon which to base a finding of scientific equivalency."[3] The decision stated that to qualify for duty-free treatment, an applicant must show that it intends to use the foreign article in either scientific research or formal science-oriented education. This conclusion was based on the statutory requirement that an article may be imported duty-free if no instrument or apparatus of equivalent scientific value for the purposes for which it is intended to be used is being manufactured in the United States. The Director reasoned that "unless an applicant actually intends that an article will be used by an institution 'established for educational or scientific purposes' in a manner which has some scientific value within the context of its intended use, the required scientific equivalency determination would be meaningless."

Because MATES intended to use the simulators in what the Secretary concluded was a purely vocational activity, the application was denied.

## II

■ The Secretary of Commerce has interpreted the statute as permitting duty-free entry only for articles intended to be used for scientific research or formal science-oriented education.[4] Under the stat-

---

**2.** The Department determined that appellant's resubmission did not comport with the regulatory requirements. Appellant does not challenge this determination. We, therefore, decide only whether appellant's initial application was improperly denied.

**3.** The Secretary of Commerce has delegated his authority over this matter to the Director of the

Office of Import Programs. 15 CFR 301.1(a); 38 Fed.Reg. 9,324 (1973).

**4.** The current regulations which became effective July 28, 1982 provide in § 301.5(d) iii that the applicant's intended purposes must include either "scientific research or science-related educational programs." 47 Fed.Reg. 32517; 32520 (1982). Appellant contends that the standard

ute this court has jurisdiction to review questions of law, which includes the determination whether the agency's factual findings are supported by substantial evidence. *University of North Carolina v. Department of Commerce,* 701 F.2d 942 (Fed.Cir. 1983). Our examination of the statutory language and legislative history convinces us that the Secretary's determination that the article must be used for scientific research or formal science-oriented education has no basis in the law, *Train v. Natural Resources Defense Counsel,* 421 U.S. 60, 95 S.Ct. 1470, 43 L.Ed.2d 731 (1975), and that this standard has been arbitrarily applied to appellant in this case, 5 U.S.C. § 706.

According to the language of the statute, an article is entitled to duty-free entry: (1) if it is entered for use by any nonprofit institution established for scientific or educational purposes, and (2) no instrument or apparatus of equivalent scientific value for the purposes for which it is intended to be used is being manufactured in the United States.

The Secretary's determination that foreign instruments and apparatus are permitted duty-free entry only if they are intended to be used for scientific research or formal science-oriented education, and, therefore, not for vocational training, is based on his interpretation that use of the foreign article must have some scientific value. This interpretation is in turn based on the "equivalent scientific value" determination which the Secretary is required to make.

We agree with the government that according to the legislative history, the equivalent scientific value determination is the most important test for determining duty-free entry of a foreign article. S.Rep. No. 1678 at 3265; H.R.Rep. No. 1779 at 18. We also agree with the government that according to the statute, the Secretary must make this determination in the context of intended use of the foreign article.

We do not agree, however, that because of this requirement, it is reasonable to conclude that the foreign article must be used in scientific research or in formal science-oriented education. What the Secretary has done in this case is to graft onto the stated purposes for which the instrument can be used, educational or scientific research, the additional requirement that the educational purpose must be a formal science-oriented one (undefined) and to conclude that appellant's vocational purposes disqualify the simulators from duty-free entry under the Act.

The government makes a two-step argument to support this position. First, it argues that because the scientific equivalency determination must be made in the context of the instrument's intended use, the foreign article must have a scientific purpose. Then the government contends that the Secretary's consistent interpretation of the statutory scheme that the instrument must be intended to be used in scientific research or in formal science-oriented education is reasonable in light of the scientific purpose requirement.

The government contends that because classification of imports as scientific instruments has depended upon their use and since Congress has conditioned duty-free entry under item 851.60 upon an intended use with a scientific value, it is obvious that only foreign instruments intended to be used for scientific purposes qualify for duty-free treatment under 851.60. It also contends that any other interpretation would render the scientific equivalency determination meaningless. We disagree.

The statute states that duty-free entry will be permitted for:

Articles entered for the use of any nonprofit institution, whether public or pri-

---

expressed in the new regulations is different from the standard applied in the instant case. The government contends that the new regulation imposes no different standard from that applied in the instant case and that applied in

the past. We need not and do not resolve this issue because the new regulations were not in effect at the time appellant's application was denied.

vate, established for educational or scientific purposes.

The government contends that educational or scientific merely refers to the type of institution which can import articles duty-free. However, the plain language of the statute states "for educational or scientific purposes." Moreover, Annex D to the Florence Agreement, which the provision in issue implements, explicitly states that duty-free entry is to be provided for "scientific instruments or apparatus, intended exclusively for *educational purposes or* pure scientific research."[5] (Emphasis added.)

The legislative history of the Act also indicates that Congress intended the statute to apply to articles imported for educational purposes, as well as for scientific research. As was stated in the Senate Report which accompanied the legislation:

> In short, instruments or apparatus of types not domestically produced would be admitted free of duty if imported by a qualified nonprofit institution for use exclusively in its noncommercial scientific *or educational* pursuits. S.Rep. No. 1678, at 3265; H.R. No. 1779 at 18. [Emphasis added.]

The legislative history also makes clear that the scientific equivalency determination is not intended to limit the purposes of the institution but rather is concerned with the performance characteristics of the imported article. As was stated in a letter from the Secretary of State to the House Ways and Means Committee in describing the scientific equivalency evaluation:

> As a general rule the articles would be compared on the basis of total overall performance. However, they would be compared where pertinent on the basis of specific differences between them. Evaluations of equivalency between domestic and foreign instruments or apparatus will be based on the structural and operational characteristics that are relevant to the functions which an article, such as that for which duty-free treatment is sought, is designed to perform. One article shall be considered equivalent to another, if there are no significant differences between them with respect to the pertinent characteristics. *Implementation of Florence and Beirut Agreements: Hearings on H.R. 8664 and H.R. 15271 before the Committee on Ways and Means*, 89th Cong. 1st Sess. 9, 12–13.

The reason why the scientific equivalency determination is to be made in the context of the article's intended use is so that foreign instruments which can satisfy the institution's requirements will not be admitted duty-free if there is a domestic article which can also satisfy the institution's needs:

> Under the bill the determination of equivalent scientific value is to be in terms of equivalent scientific value for the purposes for which the instrument or apparatus is intended to be used. This will prevent the bill from resulting in the duty-free entry of an instrument or apparatus in a case where there is available a domestic article which, though different from the article in some scientific characteristics, nevertheless is as capable as is the foreign one of fulfilling the purposes for which the instrument or apparatus is intended to be used. S.Rep. No. 1678 at 3265.

Nowhere does the statute or the legislative history indicate that because the Secretary is required to ascertain whether there is a domestic article of equivalent scientific value to the foreign article and because the

---

5. The text of Annex D reads:

ANNEX D

SCIENTIFIC INSTRUMENTS OR APPARATUS

Scientific instruments or apparatus, intended exclusively for educational purposes or pure scientific research, provided:

(a) That such scientific instruments or apparatus are consigned to public or private scientific or educational institutional [sic] approved by the competent authorities of the importing country for the purpose of duty-free entry of these types of articles, and used under the control and responsibility of these institutions;

(b) That instruments or apparatus of equivalent scientific value are not being manufactured in the country of importation.

Secretary must make this determination in the context of intended use of the article, that use of the article must be for purely scientific purposes, or, as stated by the Secretary, for scientific research or formal science-oriented education. According to the statute's language and the legislative history, the institution may use the instrument or apparatus for scientific research *or* for its educational pursuits.

■ Although we agree with the government that in order for the Secretary to make his scientific equivalency determination the article must have some "scientific value" for its intended use, we, however, do not agree that this means that the article must be used in formal science-oriented education. We also do not agree that an article imported for use in vocational training is excluded from the benefits of the Act. There is nothing in the statutory language or the legislative history to support the Secretary's position and it directly contravenes the broad purposes of the Act which is designed to foster the free flow of educational and scientific materials across national borders. This court is not bound by an administrative agency interpretation which does not comport with Congressional intent, *United States v. Sumitomo Shoji,* 534 F.2d 320 (Cust. & Pat.App.1976).

### III

The government also contends that the requirement that use of the article must be for scientific research or formal science-oriented education is a reasonable interpretation of the statute because Congress has failed to define the term "scientific," scientific is a very broad term, and the Secretary has consistently interpreted the term scientific as requiring that a particular foreign article be used in scientific research or formal science-oriented education. What the Department means by formal science-oriented education was stated in its first rejection of MATES' application:

To permit the determination of scientific equivalency required by Pub.L. 89–651, the application must show use of the foreign article in scientific research or formal science-oriented education (e.g., courses in chemistry, physics, biology etc.).

■ The Secretary, however, has not consistently interpreted the statute as requiring that the article must be used in formal science-oriented education and, therefore, that vocational training in a scientific field is a precluded use under the statute. This is a new requirement arbitrarily imposed on MATES in this case.

During 1968–1971, several vocational and public schools were permitted to import duty-free certain Theory of Electricity Kits which were used for teaching the basic theory of electricity by having students construct electrical articles.[6] The government attempts to distinguish these cases on the basis that a vocational training school can also teach science-related courses in addition to pure vocational training. However, there was no suggestion in these cases that the imported devices failed to qualify under the statute because these vocational training programs did not constitute "formal science-oriented education." Moreover, in its decision in the instant case, the Department stated:

We, of course, considered teaching the underlying theory of electricity a scientific educational purpose, even though such training was being given in vocational schools or community colleges. *If the Department erred in an earlier case, involving a theory of electricity device, which we do believe was the case, we are not obligated to perpetuate the error.* [Emphasis added].

■ Further, in the series of cases cited by the government in which the Secretary denied the duty-free importation of foreign articles used in vocational training, there was no indication that the foreign article

---

**6.** *I.B.E.W. Electrical Workers Educational Training Centre,* 33 Fed.Reg. 10659 (1968); *Occupational Centre (Belmont, N.Y.),* 36 Fed.Reg. 19450 (1971); *Hawaii Technical School,* 34 Fed.Reg. 8171 (1969); *Downey Unified School District,* 33 Fed.Reg. 15885 (1968); *Rio Handan Junior College,* 33 Fed.Reg. 15587 (1968).

had to be used in formal science-oriented education.[7] In those decisions, the Secretary stated time and again that some scientific use of the article, whether educational or research, must be intended. The Department did not state that the article must be used in formal science-oriented education, and in most of these cases there was no suggestion that the foreign article was to be used in a scientific field.[8] We agree with the government that the Secretary has consistently required that the article must have some scientific value or use in order to perform the scientific equivalency determination. We, however, do not agree that the Secretary has consistently required that the article must be used in formal-science oriented education in order to satisfy the requirements of the statute. We also do not agree that the Secretary has consistently ruled that articles used in vocational training are excluded from the benefits of the Act. An agency is obligated to follow precedent, and if it chooses to change, it must explain why. *See Greater Boston Television v. FCC*, 444 F.2d 841 (D.C.Cir.1970).

## IV

■ The government's final contention is that appellant intends to use the simulators to teach an "art" and not a "science" and, therefore, that there was substantial evidence to support the Secretary's conclusion that the simulators possessed no scientific value for their intended use. However, as the government itself argues, "scientific" is a very broad term and we hold that for the purposes of this Act it includes the applied sciences such as navigation and aviation as well as the customary academic sciences such as physics, chemistry, and biology.[9]

7. *South Shore Vocational Technical High School*, 32 Fed.Reg. 8184 (1965) (article designed to perform operations on sheet metal); *Los Angeles County Museum of Art*, 33 Fed.Reg. 2573 (1968) (device for restoration of paintings); *New York Institute of Technology*, 36 Fed.Reg. 2636 (1971) (perspective drawing), *Texas A & M University*, 36 Fed.Reg. 1923 (1971) (profile milling machine); *The Catholic University of America*, 37 Fed.Reg. 43529 (1975); (Music Synthesizer) Students International Meditation Society, 40 Fed.Reg. 43529 (1975) (videotape prompter); *Maine Maritime Academy*, 44 Fed.Reg. 16366 (1982) (marine diesel propulsion simulator); *Maritime Institute of Technology*, 48 Fed.Reg. 17637 (1982) (Deviascope to be used in a training course for obtaining U.S. Coast Guard mariner's license), 48 Fed.Reg. 17636 (1982) (radio navigation simulator).

8. The government cites only three cases which arguably concerned vocational training in a scientific field. Two of these cases involved appellant, *Maritime Institute of Technology*, 48 Fed. Reg. 17636 and 17637 (1982). The third case was an application for a marine diesel propulsion simulator intended to be used in an undergraduate engineering curriculum in Modern Diesel Operations, *Maine Maritime Academy*, 47 Fed.Reg. 16366 (1982). We note that while the Secretary did state that the article must be used in scientific research or for science-related education, he did not use the formal science-oriented test imposed in the instant case.

9. The government cites a series of cases which it contends stand for the proposition that the Court of Customs and Patent Appeals has consistently held that the term "scientific instruments" refers only to those instruments used in the pure as distinguished from the applied sciences. *See, e.g. W.L. Conover v. United States*, 17 CCPA 324 (1929); *United States v. C.H. Stoelting Co.*, 21 CCPA 588 (1934); and *United States v. Adlanco Industrial Products Corp.*, 21 CCPA 249 (1933). What the government fails to point out is that these cases involved the court's interpretation of paragraph 360 of the Tariff Acts of 1922 and 1930; the court specifically limited its holding to that section; and the court reached its conclusion based on its perception of congressional intent for that particular Act. In the cases cited by the government, the court held that the general term "scientific instruments", as used in paragraph 360, referred only to those instruments used in the pure sciences because Congress also included in paragraph 360 a specific enumeration of instruments used in the applied sciences. The court reasoned that the term "scientific instruments" must refer only to instruments used in the pure sciences, else Congress would not have felt the need to specifically list instruments used in the applied sciences in the same paragraph. 17 CCPA at 327–8. It is clear that the cases cited by the government do not establish a general proposition that the term "scientific instruments" means only those instruments used in the pure sciences. Nor do the cases stand for the proposition that courts have consistently given the term "scientific instruments" a narrow interpretation. The cases only involve the court's interpretation of particular statutory language in a particular case. Moreover, none of the cases were concerned with the statute now before us, but only with

It is basic customs law that terms used in the TSUS are to be given their common meaning absent some special circumstance calling for a more specialized meaning. *Trans-Atlantic Co. v. United States*, 471 F.2d 1397, 1398 (Cust. & Pat.App.1973). "A court, in determining common meaning, may rely upon its own understanding of terms used and may consult standard lexicographic and scientific authorities." 471 F.2d at 1398.

"Navigation" is defined in *Webster's Third New International Dictionary* (Unabridged Ed., 1966, p. 1509) as:

"Navigation. 1. the act or practice of navigating. 2a. the *science* or art of conducting ships or aircraft from one place to another; esp: the method of determining position, course, and distance traveled over the surface of the earth by the principles of geometry and astronomy and by reference to devices (as radar beacons or instruments designed as aids). [Emphasis added.][10]

The interpretation that navigation is a science for purposes of the Act is in keeping with the broad purposes of the Act and it is consistent with our decision in *University of North Carolina v. Department of Commerce*, 701 F.2d 942 (Fed.Cir.1983), wherein we stressed that it is not up to the Secretary to make value judgments regarding the nature or value of an institution's programs.

The government argues that appellant did not apply for duty-free treatment for navigational instruments and that appellant did not intend to use the simulators to teach the "science" of navigation. Rather, the government contends that MATES intended to use the articles merely to improve the existing shiphandling skills of experienced and licensed ships officers which, the government argues, is not a science. We do not agree.

MATES applied for a "Shiphandling simulator for shiphandling and marine navigation training" and it was to be used in a course whose purposes were: (1) to teach students to plan and execute safe operations in realistic situations, (2) to develop a thorough understanding of the internal and external force effects on a ship during navigation, and (3) to provide a basis for standard bridge team organization. Unless a student had taken courses in all-weather navigation and electronic navigation prior to enrolling in the shiphandling course, he would have to take a refresher course which covered an in-depth review of radar and electronic navigation. Students taking the course were also required to understand the effects of hydrodynamics on ship performance and to understand the equations of motion which form the basis for physical phenomena affecting ship motion.

■ The government contends that the fact that the practical training may involve technical and sophisticated concepts in the fields of marine navigation, hydrodynamics, radar, and electronic navigation does not mean that these areas were to be taught in the simulator courses. However, it is clear that the simulators were intended to be used to teach the students how to apply this scientific knowledge.[11] Merely

---

classification of merchandise under competing provisions of the Tariff Act.

**10.** Numerous books and scientific journals also *define navigation and seamanship as a science.* To cite just one example: "Navigation is the art and science of determining the position of a ship and of conducting a ship safely from one position to another." *Navigation and Operations/Fundamentals of Naval Science*, Vol. 3, p. 4 (Naval Institute Press, 1972.) (Cir.1983).

**11.** The Department's view on the meaning of "scientific" disregards the most elementary dictionary definitions of the word: "of, or relating to, or exhibiting the methods or principles of

*science,*" which, in turn, is defined as: "1a: possession of knowledge as distinguished from ignorance or misunderstanding; *b*: knowledge attained through study or practice. *2a*: a department of systematized knowledge as an object of study (the—of theology); *b*: something (as a sport or technique) that may be studied or learned like systematized knowledge; *c*: one of the natural sciences. *3*: knowledge covering general truths or the operation of general laws esp. as obtained and tested through scientific method: *specif.* NATURAL SCIENCE. *4*: a system or method based on or purporting to be based upon scientific principles. *5 cap*: CHRIS-

because the simulators were intended to teach students the practical application of scientific knowledge in a vocational training setting does not mean that they would not be serving an educational purpose in a scientific field.

■ Moreover, the Secretary did not deny appellant's application because the simulators were intended to be used to teach an "art" and not a "science". The Secretary denied appellant's application because vocational training did not comport with his conception of formal science-oriented education in such fields as biology, chemistry and physics. We hold, however, that vocational training in a scientific field does come within the Act and conclude that appellant's use of the simulators was to educate and train students in such a scientific field.

### V

After determining that appellant's application did not present a prima facie case upon which to base a finding of scientific equivalency, the Secretary proceeded to address the issue of whether there was a domestic instrument of equivalent scientific value. However, because the Secretary determined that the instrument possessed no scientific value for its intended purposes, he addressed the scientific equivalency determination in the most cursory fashion. We therefore reverse the Secretary's determination that there was no prima facie case upon which to base a finding of scientific equivalency and remand the case to the Secretary so that he can perform a proper scientific equivalency evaluation in order to determine whether the simulators can be imported duty-free.

REVERSED and REMANDED.

TIAN SCIENCE." [WEBSTER'S seventh New Collegiate dictionary.]