**PBI–GORDON
CORPORATION, Plaintiff,**

*v.*

**Lee M. THOMAS, Administrator,
Environmental Protection
Agency, Defendant.**

**No. 84–1147–CV–W–1.**

United States District Court,
W.D. Missouri, W.D.

April 26, 1985.

136

John T. Maughmer, Stephen W. Jacobson, Lathrop, Koontz, Righter, Clagett & Norquist, Kansas City, Mo., for plaintiff.

Charles A. O'Connor III, McKenna, Conner & Cuneo, Washington, D.C., for amicus curiae.

Charles E. DiLeva, Dept. of Justice, Washington, D.C., Robert G. Ulrich, U.S. Atty., Vernon A. Poschel, Asst. U.S. Atty., Kansas City, Mo., for defendant.

## MEMORANDUM AND ORDER

JOHN W. OLIVER, Senior District Judge.

This case pends on the parties' cross-motions for summary judgment, filed April 10, 1985. Chemical Specialties Manufacturers Association (CSMA), in accordance with the consent of the parties and leave of court, filed a brief amicus curiae on that date. Defendant filed a response to plaintiff's cross-motion on April 17, 1984 and plaintiff has informed the Court that it does not intend to file a response to defendant's motion. Accordingly, the cross-motions in regard to EPA's authority to adopt 40 C.F.R. § 152.85[1] are in an appropriate posture for ruling pursuant to Rule 56 of the Federal Rules of Civil Procedure. For reasons stated below, plaintiff's motion for summary judgment will be denied and defendant's motion for summary judgment will be granted.

## I.

The material facts in this case are not in dispute. They have been stipulated by the parties[2] and, accordingly we make the following findings of fact:

1. Venue in the United States District Court for the Western District of Missouri is not contested. 28 U.S.C. § 1391(e)(4). [3]

2. The subject matter of this action is limited to the provisions of FIFRA, Section 3, established under the 1978 Amendments to FIFRA.... [6]

3. PBI–Gordon Corporation is a producer of pesticide products, including manufacturing concentrates, formulation, and end-use products. [8]

4. Manufacturing concentrates and formulation intermediaries are pesticide products that combine the purest form of an active pesticide ingredient(s) (technical products) to formulate substances used for the formulation of end-use products. [9]

5. End-use products are developed, produced and/or formulated by combining or diluting technical products, manufacturing concentrates and/or formulation intermediaries with inert ingredients. [11]

6. 40 C.F.R. § 162.9–7(c) states:

(c) as used in this section, the term "end-use product" means a pesticide product whose labeling bears instructions for using or applying the product (as packaged and sold, or after dilution by the applicator) for controlling pests or regulating plant growth. The term excludes products whose labeling allows use of the product to formulate other pesticide products. [10]

7. FIFRA requires that all persons or entities desiring to sell pesticide products in the United States must obtain registration of those products with the Environmental Protection Agency. [12]

8. Section 3(c)(1)(D) of FIFRA requires, if requested by the EPA Administrator, that applicants for registration of pesticide products must submit or cite data to the Environmental Protection Agency demonstrating the safety and efficacy of the pesticide products for which registration is sought. [13]

9. Section 3(c)(2)(D) of FIFRA, 7 U.S.C. § 136a(c)(2)(D), provides an exemption to

---

**1.** The regulation states in pertinent part:

(a) FIFRA [Federal Insecticide, Fungicide and Rodenticide Act] Section 3(c)(2)(D) excuses an applicant from the requirement to submit or cite data pertaining to the safety of any ingredient (or mixture of ingredients) contained in his product that is derived solely from one or more EPA-registered products (which the applicant purchases from another producer.)

**2.** In preparation for the filing of their cross-motions, on April 1, 1985 the parties agreed upon and filed a commendably detailed stipulation of facts, with attachments. The original paragraph numbers of the stipulations are shown in parentheses following the paragraphs, which have been renumbered for clarity.

certain of the registration requirements of Section 3(c)(1)(D). [14]

10. The exemption in Section 3(c)(2)(D) of FIFRA is commonly referred to as the formulator's exemption. [15]

11. The regulation to be codified as 40 C.F.R. § 152.85 would extend the formulator's exemption from certain registration requirements to include not only end-use products, but manufacturing concentrates and formulation intermediaries, which products contain active ingredients which are purchased registered pesticide products. [16]

## II.

### A.

Plaintiff contends that EPA's expansion of the formulator's exemption to other than end-use products and EPA's new regulation codified at 40 C.F.R. § 152.85 "contravene the clear, unambiguous language of section 3(c)(2)(D) of FIFRA," because that section directly refers to and limits application of the formulator's exemption to end-use products:

Exemptions—no applicant for registration of a pesticide who proposes to purchase a registered product from another producer *in order to formulate such purchased pesticide into an end-use product* shall be required to.... (7 U.S.C. § 136a(c)(2)(D) (emphasis added)).

Pl. Brief at 7. There is no dispute in regard to plaintiff's assertion that the current definition of "end-use" product "excludes products whose labeling allows use of the product to formulate other pesticide products." 40 C.F.R. § 162.9–7(c)(1984). Plaintiff asserts that this definition is a statutory limitation of the formulator's exemption to end-use products which "is clear and must be given legal effect because specific exemption is given to 'end-use' products to the exclusion of all other types of products, including formulation intermediaries and manufacturing concentrates."

Plaintiff further argues that section 3(c)(2)(A) [3] only gives EPA authority to establish guidelines for the kinds of *information* submitted by applicants and not authority to exempt classes of pesticide *products* from the requirements of section 3(c)(1)(D). Similarly, plaintiff also contends that EPA's exemption authority pursuant to section 25(b) [4] of FIFRA does not apply in this case because there, is no claim that the products are either adequately regulated by another federal agency or that they are of a character which is unnecessary to be subject to the Act. Pl. Brief at 11.

In short, plaintiff contends that under *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* —— U.S. ——, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), the statutory exemption should be given its "plain, clear and common meaning," because "[i]n the present case, FIFRA is not silent or ambiguous respecting the meaning and scope of the formulator's exemption." Pl. Brief at 13.

In the alternative, plaintiff also argues that the agency's interpretation should not be afforded a certain deference in this case because EPA's most recent interpretation of the formulator's exemption is inconsistent with EPA's prior interpretation of that exemption and the agency has not identified any justification for completely abandoning its prior interpretation. Pl. Brief at 22.

### B.

Defendant contends "construing all provisions of FIFRA, that [its regulation should be upheld because] EPA was granted unambiguous authority by Congress to eliminate unnecessary registration requirements" and that such authority is found in sections 3(c)(1)(D) and 25(a) of the Act [7 U.S.C. §§ 136a(c)(1)(D) and 136w(b) ]. D.Resp. Brief at 2–3. Defendant argues that "FIFRA nowhere states that end-use formulators are the only formulators eligible for exemptions from data requirements

---

3. Pertinent portions stated *infra.*

4. Codified at 7 U.S.C. § 136w(b).

... the most that can be said ... [against the new regulation] is that section 3(c)(2)(D) is ambiguous on the issue of whether the formulator's exemption may be extended to intermediate products." Defendant further contends that this Court should, therefore, "grant deference to EPA's interpretation of FIFRA and uphold 40 C.F.R. § 152.85 since there exists a rational basis for promulgation." D.Resp. Brief at 2, 3 (also citing *Chevron, supra,* and *Chemical Manufacturer's Assn. v. NRDC,* —— U.S. ——, 105 S.Ct. 1102, 84 L.Ed.2d 90 (1985)).

### C.

CSMA supports defendant's position and contends that "the intermediate formulator exemption is a reasonable exercise of both rulemaking authority under §§ 3(c)(2)(C) and 25(a)(1) and agency discretion under § 3(c)(1)(D), and is not barred by, or inconsistent with, § 3(c)(2)(D)." CSMA argues that "Congress gave the Administrator broad authority to relieve formulators of the registration burdens" which S.Rep. No. 334 noted had "ground [pesticide registrations] to a virtual halt." Amicus Brief at 16. CSMA also argues that broadening the formulator's exemption is not only within the EPA's authority but is a reasonable exercise of that authority because it is consistent with congressional intent:

> By limiting the exemption to intermediate formulators who purchase registered active ingredients, the Administrator assures that the basic registrant who generated or paid for production of the safety data on the underlying registered active ingredient receives compensation through the purchase price of the pesticide.

Amicus Brief at 17–18.

Finally, CSMA also implicitly contends that EPA has the authority to expand the formulator's exemption because the statute is silent or ambiguous in that "Congress did not further analyze the category of pesticide formulator, or otherwise seek to distinguish formulators of intermediate pesticides from formulators of end-use pesticides." Amicus Brief at 14.

### III.

Both parties and amicus appropriately cite *Chevron* in regard to the standard of review which applies in this case. The first question is "whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; ... if the statute is silent or ambiguous with respect to the specific issue, the question is ... whether the agency's answer is based on a permissible construction of the statute." *Chevron,* —— U.S. at ——, 104 S.Ct. at 2781.

### A.

The Federal Pesticide Act of 1978, Pub.L. No. 95–396, 92 Stat. 819, *codified at* 7 U.S.C. §§ 136(a) through 136y, expressly authorizes the Administrator of the EPA "to prescribe regulations to carry out the provisions" of the Act and to "take into account the difference in concept and usage between various classes of pesticides and differences in environmental risk and the appropriate data for evaluating such risk between agricultural and nonagricultural pesticides." 7 U.S.C. § 136w(a)(1). Thus, Congress clearly granted the Administrator authorization to prescribe regulations which take into account environmental risk.

Congress provided a procedure for applicants to register products not exempt from the general registration requirement:

> Each applicant ... shall file ... a statement which includes—
>
> (A) the name and address of the applicant; ...
>
> (B) the name of the pesticide;
>
> (C) a complete copy of the labeling of the pesticide; ...
>
> (D) except as otherwise provided in subsection (c)(2)(D) of this section, *if requested by the Administrator,* a full description of the tests made and the results thereof upon which the claims are based, or alternatively a citation to data that appear in the public literature or that previously had been submitted to the Administrator and that the Adminis-

trator may consider in accordance with the following provisions:

(i) With respect to pesticides containing active ingredients that are initially registered under this subchapter after September 30, 1978, data submitted to support the application for the original registration of the pesticide, or an application for an amendment adding any new use to the registration and that pertains solely to such new use, shall not, without the written permission of the original data submitte[r], be considered by the Administrator to support an application by another person during a period of ten years following the date the Administrator first registers the pesticide: *Provided,* That such permission shall not be required in the case of defensive data;

(ii) except as otherwise provided in subparagraph (D)(i) of this paragraph, with respect to data submitted after December 31, 1969, by an applicant or registrant to support an application for registration, experimental use permit, or amendment adding a new use to an existing registration, to support or maintain in effect an existing registration, or for reregistration, the Administrator may, without the permission of the original data submitter, consider any such item of data in support of an application by any other person (hereinafter in this subparagraph referred to as the "applicant") within the fifteen-year period following the date the data were originally submitted only if the applicant has made an offer to compensate the original data submitter and submitted such offer to the Administrator accompanied by evidence of delivery to the original data submitter of the offer.

. . . .

(E) the complete formula of the pesticide; and

(F) a request that the pesticide be classified for general use, for restricted use, or for both.

7 U.S.C. § 136a(c)(1)(D) (emphasis added).

Section 136a(c)(2)(A) provides in part: "The Administrator shall publish guidelines specifying the kinds of information which will be required to support the registration of a pesticide and shall revise such guidelines from time to time."

Although the Act specifically defines 31 terms,[5] it does not define the terms whose meaning has been stipulated by the parties: "manufacturing concentrates"; "formulation products"; "end-use products"; and "formulation intermediaries." The term "producer," which appears in the formulator's exemption, is defined as "the person who manufactures, prepares, compounds, propagates, or processes any pesticide or device or active ingredient used in producing a pesticide.... The dilution by individuals of formulated pesticides for their own use ... shall not of itself result in such individuals being included in the definition of 'producer' for the purposes of this subchapter." 7 U.S.C. § 136(w).

### B.

Congress did not explicitly exclude formulation intermediaries, nor did it even define them or distinguish them as separate products. The formulator's exception recognizes only two types of pesticides, "registered pesticide," which comes from a producer as defined by section 136(w), and "end-use product." This dichotomy is placed in clearer focus by the legislative history of the Act. The House version of the formulator's exemption, which was not adopted by the joint conference committee, states:

[N]o applicant for registration of a pesticide who proposes to purchase a registered *basic pest control chemical* from another producer in order to formulate the purchased pesticide into an end-use product shall be required to (i) submit *or cite data* pertaining to the safety of the *basic pest control chemical as opposed to the safety of the formulated pesticide,* or (ii) offer to pay reasonable compensation otherwise required for the use

---

5. 7 U.S.C. §§ 136(a) through 136(ee).

of such data. The term "basic pest control chemical" is defined to mean a pesticide that is not intended to be applied for pest control purposes without further formulation, but is intended to be used in producing a formulated pesticide; and the term "formulated pesticide" is defined to mean a pesticide that is intended to be applied for pest control purposes without further mixing or formulation, or after mixing with water or other diluant by the applicator. (Emphasis in original).

H.R.Rep. No. 1560, 95th Cong. 1st Sess. 33, *reprinted* in 1978 U.S.Code Cong. & Ad. News 1966, 2043, 2049.

Comparison of the above House version with the formulator's exemption as finally adopted and codified establishes that the statute addresses only two categories of pesticides, "registered" and "end-use."

In *Ruckelshaus v. Monsanto Co.,* — U.S. —, —, —, 104 S.Ct. 2862, 2870, 2880, 81 L.Ed.2d 815 (1984), the Supreme Court implicitly affirmed the district court's findings that FIFRA deals with only two groups, manufacturers of "manufacturing-use products not generally sold directly to users of pesticides" and "formulators" who add inert ingredients to dissolve, dilute or stabilize active components, thereby producing "end-use products."

■ Accordingly, we find and conclude that the statute is silent and has not spoken to the "precise question" at issue, the permissible scope of the formulator's exemption. We further find that the Act vests defendant with the authority to prescribe regulations to carry out the provisions of the Act, to request information from prospective registrants and to publish guidelines specifying the kinds of information required to support the registration of pesticide products. We conclude, therefore, that the Act authorizes defendant to adopt regulations in regard to the kinds of information which are subject to the general filing requirements of section 136a(c)(1)(D) and in regard to the provisions of section 136a(c)(2)(D), the formulator's exemption.

### C.

Having answered the question as to defendant's authority to promulgate regulations in the affirmative, the next inquiry is whether the Agency's regulation 40 C.F.R. 152.85 is based on a permissible construction of the statute. *Chevron, supra,* — U.S. at —, 104 S.Ct. at 2781.

■ This Court need not conclude that the Administrator's construction of the Act was the only one the Agency could have adopted to uphold the regulation, or even the conclusion this Court would have reached. *Chevron* appropriately stated that it is a "well-settled" principle that "considerable weight" should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer. *Id.; see e.g., Brotherhood of Railway and Airline Clerks,* 722 F.2d 380, 381 (8th Cir.1983). The regulation must be upheld unless it is arbitrary and capricious, that is, where it is "not supportable on any rational basis." 722 F.2d at 381 (citing additional Eighth Circuit cases).

Plaintiff's brief at page 22 concedes, as it must, that an agency interpretation of the statute it administers "should normally be afforded a certain deference." Plaintiff contends, however, that in this case "deference should not be accorded EPA's most recent interpretation of the formulator's exemption when that interpretation is inconsistent with EPA's prior interpretation ... made contemporaneously with the enactment of the exemption."

■ Plaintiff's attempt to assert an implicit theory of estoppel is unpersuasive for two reasons. First, EPA's "prior interpretation" at 40 C.F.R. § 162.9–7(c) construed the term "end-use product." It did not purport to prohibit extension of section 3(c)(2)(D) itself.[6] Secondly, while a prior

---

**6.** The then current Administrator testified during hearings on the bill in favor of a "generic approach" to registration "in which it is the technical material which becomes the focal

consistent interpretation or a record of flexible definitions would add force to the Agency's assertion that deference is due to the current interpretation, the absence of those factors carries no presumption that the Agency's interpretation is unreasonable, arbitrary or capricious. *Chevron* noted that:

> An initial agency interpretation is not instantly carved in stone. On the contrary, the agency, to engage in informed rulemaking, must consider varying interpretations and the wisdom of its policy on a continuing basis.

*Chevron, supra,* —— U.S. ——, 104 S.Ct. at 2792.

The legislative history of the statutory provisions dealing with compensation for data used in obtaining registration of pesticides pursuant to the Act shows that those provisions were "the subject of tremendous controversy between the basic manufacturers of technical grade material and pesticide formulators." H.R.Rep. No. 343, 95th Cong. 1st Sess. 3, *reprinted* in 1978 U.S. Code Cong. & Ad.News (92 Stat) 1966, 1968. The House Report accompanying H.R. 8681, *reprinted in* 1978 U.S.Code Cong. & Ad.News, *supra* at 1991, stated that the bill "struck a careful balance between the interests of the small formulator and the need for encouraging competition in the pesticide business, on the one hand, and the need to assure the continued research and development of new pesticides by recognizing the limited proprietary interest of those who have incurred the expense of developing ... data."

The then Administrator of the EPA echoed that concern in his testimony before the Congress, see footnote 6, *supra,* and his successor has reiterated the same balancing of interests in support of regulation 152.85:

> Since the costs that FIFRA section 3(c)(1)(D) is intended to recoup for producers are generally included in the purchase price of the pesticide they sell, that section would have the effect of requiring producers who purchase these pesticides in effect to pay data development costs twice—once as a condition of obtaining registration, and thereafter as part of the price of the pesticide they purchase to make their products.

Although section 3(c)(2)(D) specifies that only end-use producers are eligible for the formulator's exemption, the legislative history of the statute offers additional guidance on the intent of Congress. The Report of the House Committee on Agriculture states:

[The House bill] would obviate the need for formulators to furnish certain registration data by providing authority for "generic" registration. Under the "generic" registration plan, detailed submissions and evaluations of the basic chemical need not be repeated with each formulation ... Applications will be simplified and formulators relieved of the need to offer to pay for the registration data except in the purchase price of the basic pest control chemical. [H.Rep. No. 95–663, 95th Congress, 1st Session, p. 19.] It seems clear that the purpose of the formulator's exemption was to eliminate duplicative payment of data development costs. The same rationale that underlies the exemption for end-use products would also hold true for any other product whose active ingredients were purchased from another producer in the form of a registered product.

---

point for registration, ... rather than the end-use registrations." The Administrator stated that "[t]his would mean that the issues of compensation for the most expensive data ... would be worked out among the registrants of technical products. The cost of that data could be included in the price for which the technical product sells. Thus, the formulator would in effect be buying data rights along with the technical material, without having to go through the 3(c)(1)(D) procedures." 1978 U.S.Code Cong. &

Ad.News at 1976. Defendant's current position, although advanced by a new Agency Administrator under a new Administration, is entirely consistent with EPA's earlier one: "[t]here is no reason to distinguish between formulators· of intermediaries and end-use products for registration purposes, since registrants who have submitted data can pass on the costs of generating that data to formulators in the purchase price regardless of the type of product the formulator sells." D. Brief at 11–12.

By limiting the exemption to end-use products, FIFRA section 3(c)(2)(D) fails, perhaps intentionally, to acknowledge the substantial body of products that are neither technical grade chemicals nor end-use products, and that logically could or should be included within the formulator's exemption. Thus the language of the statute is constraining both upon the Agency and upon applicants for registration of other types of products whose ingredients are both registered and purchased. The Agency, therefore, interprets FIFRA section 3(c)(2)(D) to apply to any product whose ingredients are both registered and purchased, without limitation as to the intended use of the product. Products that are eligible for the formulators' exemption under this interpretation include not only end-use products but also so-called "formulation intermediates" or "technical concentrates," whose producers purchase registered products which are technical grade active ingredients and reformulate them into a less concentrated intermediate product that is sold for reformulation into an end-use product.

49 Fed.Reg. 30,892 (1984) (to be codified at 40 C.F.R. § 152.85), attached as Exh. A to the parties' stipulation of facts.

Plaintiff's reliance on *National Agricultural Chemicals Association, Inc. v. U.S.E.P.A.*, 554 F.Supp. 1209, 1211 (D.D.C. 1983), is inapposite. That case involved an EPA interpretation of section 3(c)(1)(D) which required applicants to meet *more* costly registration requirements by citing all data in EPA's files to support their registration, in violation of the plain language permitting "alternatively a citation to data that appear in the public literature." Here EPA's regulation makes registration *less* costly and more expeditious for certain categories of applicants.

**D.**

■ Plaintiff's motion seeks *inter alia* preliminary and injunctive relief. Pl. Motion at 2. Assuming *arguendo* that defendant's regulation may somehow undermine a "reasonable investment-backed expectation," the Supreme Court has held that "where the operation of the data-consideration and data-disclosure provisions of FIFRA effect a taking of property ..., an adequate remedy for the taking exists under the Tucker Act." *Ruckelshaus, supra,* —— U.S. at ——, 104 S.Ct. at 2880. Even if plaintiff can establish standing sufficient to withstand a motion to dismiss,[7] plaintiff has an adequate remedy at law. Therefore plaintiff is not entitled to the equitable, injunctive relief prayed for in its present motion for summary judgment.

**IV.**

■ We stress that EPA's rationale need not be the only permissible construction of the formulator's exemption and the congressional intent behind it. We find merely that EPA's regulation is a reasonable interpretation of the formulator's exemption and that regulation 152.85 does "take into account the difference in concept and usage between various classes of pesticides," under the Agency's general authorization to promulgate regulations pursuant to 7 U.S.C. § 136w. We conclude, therefore, that EPA's understanding of this very complex statute is a sufficiently rational one to preclude this Court from substituting its judgment for that of EPA. *See Chemical Manufacturer's Assn., supra,* —— U.S. at ——, 105 S.Ct. at 1108 (quoting *Train v. NRDC,* 421 U.S. 60, 75, 95 S.Ct. 1470, 1479, 43 L.Ed.2d 731 (1975) and citing *Chevron, supra,* —— U.S. at ——, 104 S.Ct. at 2781).

Accordingly, it is

---

**7.** At pretrial conference held March 20, 1985, the parties agreed defendant's first objection in opposition to plaintiff's previous motion for summary judgment should be ruled separately from the parties' present cross-motions for summary judgment in regard to EPA's authority to adopt Rule 152.85. They further agreed that additional discovery should be conducted on the issue of whether plaintiff has shown the existence of a judicially cognizable injury sufficient to establish standing, let alone entitlement to summary judgment granting injunctive relief. Our decision today makes that issue moot.

ORDERED (1) that plaintiff's motion for summary judgment should be and is hereby denied. It is further

ORDERED (2) that defendant's motion for summary judgment should be and is hereby granted. It is further

ORDERED (3) that the Clerk of the Court shall enter judgment against plaintiff and in favor of the defendant pursuant to Rule 58 of the Federal Rules of Civil Procedure.